**ADAMS, Admx., Plaintiff, v. FLECK et, Defendants.**

Probate Court, Cuyahoga County.

No. 561248. Decided December 16, 1958.

Nathan Herstam, Sheldon Portman, Cleveland, for plaintiff.
Fleck & Fleck, John M. Ferencz, E. A. Pedley, Cleveland, for defendants.

## OPINION

By MERRICK, J.

The facts pertinent to a disposition of the question raised in this case can be found in the testimony of Sidney Fleck, one of the defendants herein. While the trial of this matter resulted in exploratory expeditions, which took the contestants far off the perimeter created by the joinder of the issues, the essential facts remain as contended by the defendants. The Court is required to interpret these facts and determine the rights of the parties.

Wherever a page number is indicated herein, it is the one of identity in the transcript furnished by defense counsel.

Adams was a very sick and troubled man. He had been injured in an industrial accident when an elevator fell in the building in which his employer was a tenant. He had asthmatic heart trouble that finally caused his death. He had domestic troubles, the nature or onus of which is unimportant to the issues herein, except that for some time prior to his death, he had been separated from his wife and she had instituted an action for divorce. The children were his, but not by this marriage. He had a desire to cut his wife off of any chance of inheritance in whatever way possible, or to restrict or limit her right of inheritance in any way legally possible.

As his physical condition worsened he consulted the defendant,

Sidney Fleck, as one of his lawyers, for advice on the subject of his wife's position in the event of his death. He received some advice thereon, the details of which are unimportant, except that a plan was projected and carried into effect, substantially as follows: While confined to a hospital by what eventually became his last sickness, he received a check in amount of $6,000.00 payable to himself and drawn on the state fund by the Workmen's Compensation Division of the Industrial Commission of Ohio.

This check was delivered to Adams in the hospital by an agent of the State of Ohio, who secured a receipt for same and certain written releases in the presence of the defendant, Sidney Fleck, his attorney, who had arranged the meeting for the delivery of the check.

Immediately upon receipt of the check, Adams endorsed the same and handed it to his lawyer with the statement: "Here it is, you know what to do with it." Thereupon Fleck took the check to his office and handed it over to his father, Charles Fleck, a defendant herein, with the statement: "not to pay any money on it. That Mr. Adams had told me to hold the check, give it to the children if anything happened to him." (12)

Sidney Fleck testified that this endorsement and delivery of the check to him by Adams was the result of a pre-arranged plan, worked out in an effort to consummate Adams' wish that his estranged wife should not receive any of the proceeds of the settlement of the industrial claim settlement. To support this conduct, Sidney Fleck testified that Adams stated that he didn't think he had too long to live, (6) and wanted to know if he distributed the expected settlement money to his children if he could get it back and was advised that he could not get it back if he gave it to one or more of them. (6 & 7) Thereupon he told his lawyer, Sidney Fleck, that he didn't want to divest himself of it completely and wanted to know if there was anything else he could do in case he would get well. (7)

Adams further stated that he expected to go to the hospital and the way he was feeling he just didn't expect to get out, but there was always that possibility that maybe they could do something for him. (7) The lawyer suggested that the check, when received, be given to someone whom Adams trusted, to hold it for the children and if he passed away that party would give it to the children; but if he got well and wanted the money he would be able to get the money. (7 and 21 and 29)

Thereupon, Sidney Fleck was designated by Adams as the one he trusted and agreed to deliver the money to him in accordance with the plan outlined above. There were mutual assurances that if Adams recovered sufficiently to leave the hospital that he would regain control of the money, (21) but that if he died, Fleck was to "pay his bills" and divide the balance amongst the children. It is admitted, of course, that at no time during his lifetime had Adams stated what bills he was referring to or that the identity or amounts were known. (11)

The check was delivered to Sidney Fleck after endorsement by Adams and then delivered by Fleck to his father, Charles Fleck, with the instructions previously quoted. Ten days later Adams died and the Flecks

were notified. The same day and within 24 hours of Adams' death, the check was deposited to the personal account of Fleck and Fleck. Almost immediately Charles Fleck started to disburse these funds, first paying himself $2000.00 or one-third as a fee. Thereafter and for a period of approximately a year and a half, Charles Fleck disbursed much of the remainder as he saw fit, to pay what he determined to be Adams' expenses. He did this on his own responsibility, with little or no consultation with anyone. To justify this conduct he asserts that he was carrying out the wishes of his deceased client, Adams.

At one stage he paid each of the seven children shares of $370.00. At the time of this trial, almost three years after the death of Adams, Charles Fleck is still holding $310.00. The widow received nothing. More than a year after the death, when the widow had learned of the payment of the $6000.00 and had inquired of Charles Fleck about it, he suggested that a share equal to that given to each child would be given to her if all children agreed. She refused to consider this plan.

This state of facts presents a problem situation which could easily have been appraised at the time of Adams' death by any lawyer with experience in probate matters and estates. The plan was a simple one in a very important aspect, viz: If Adams recovered sufficiently to leave the hospital, he wanted his money back from his lawyer. And the lawyer told him he would get it back in that eventuality. (7) In fact, Sidney Fleck was buoying him up with statements that he would recover. (7)

The law is plain and in a long line of cases determines that under these conditions there is a contingency that renders such funds transferred and held by the donor's agent attorney to be the asset of the donor's estate in event of his death. It is not necessary for this Court to apply the rules surrounding the weight of the evidence in this case. The rule is that the gift or transfer, direct or in trust, must be by clear and convincing evidence. **Flanders v. Blandy, 45 Oh St 108; Gano v. Fisk, 43 Oh St 462.** In the instant case it is crystal clear. Adams reserved the right to possession and control of the money in the event of his recovery and so instructed at the time of the endorsement and transfer.

While a gift **causa mortis** does not become effective until the death of the donor, gifts **causa mortis** as well as gifts **inter vivos** must be completely delivered during the donor's lifetime. **26 O. Jur. 2nd 164.** The gift can be upheld only when the intention of the donor is definite and certain and such intent is expressed as to a proper matter of such gift. **26 O. Jur. 2nd 149.**

Directions alone are not sufficient to create a valid gift **causa mortis.** The gift will be upheld only when it is executed and completed by delivery and by acceptance by the donee, who must have the rightful possession at the time of the death of the donor. **Sutton v. Galbraith, 11 O. C. C. (N. S.) 262; 82 Oh St 421.**

A case in which the facts are almost identical to the one at hand is found in Gano v. Fisk, supra. In that case decedent had expressed a desire that his children should have certain notes which were contained in a cabinet in the home. The day before his death he called one child

to his bedside and stated that he knew he could not get well and stated "my notes are in a box in the bureau. I want you to take them and divide them equally among you children. Take this key and you will be able to open the box." The child took the key, tried it in the lock and ascertained that it opened the box. Then she gave the key to her husband for safe keeping for fear she might lose it over night. A few hours later the father died. In that case the Supreme Court held that the notes at the time of death became an asset of the estate and cited many old cases, indicating that the law is well settled that the children never obtained unrestricted possession and control of the assets involved.

If any consideration is to be given to the interpretation that the Flecks were acting as trustees for the children, the same principles of law as to delivery and control would apply. Bear in mind that at all times Adams held out the contingency imminent or remote, that he might recover and in that event wanted re-delivery of the check. (7 & 21) To make the reservation more emphatic, Sidney Fleck instructed his father to hold the check and not pay any money on it. (12) Did this give the children any control over the fund represented by this check? As a matter of fact, they never had anything to say as to its use, either directly or through the Flecks. Charles Fleck reserved to himself full control after Adams' death. He used the fund to suit his own interpretation of the facts.

. A completed gift to a trustee is only created when the evidence shows delivery of property by the donor to a third person for the benefit of the donee, under circumstances manifesting an intention to vest **immediate** title in the donee and relinquishment of **all dominion and control** over the property; and the third person is thereby constituted a trustee for the donee. **Streeper v. Myers, 132 Oh St 323.** The test is whether any interest in the property has been retained by the donor. If the property remains under the control of the donor, although in the keeping of the third person, and the latter is subject to his further direction as to its final disposition, then his relation is that of an agent of the donor. Streeper v. Myers, supra; **Tilton v. Mullen, 101 Oh Ap 129, 134.** There must be such change of possession as to put it out of the power of the giver to repossess himself of the thing given. **Bolles v. Toledo Trust Co., 132 Oh St 21, 30.**

It may be interesting to note that in the **Bolles case,** supra, the Supreme Court held that a certain transaction, frequently called a safety deposit, had been consummated and that the securities involved were not, under the circumstances within the category of a gift, even though the donor had told his wife of the delivery of the securities to the box with the statement, "Everything in that box is yours, just salted down for you, in case!" and frequent statements to others that the contents of the box was his wife's property. In 1944, eight years after that decision, the Supreme Court again had the Bolles estate before it. In that decision, in **Bolles v. Toledo Trust Co., 144 Oh St 195,** the Court held:

"The transfer of property to a trustee under an agreement whereby the settlor reserves to himself the income during his life with the right to amend or revoke, is valid by virtue of §8617 GC (now §1335.01 R. C.), but under such a trust agreement settlor does not part absolutely with

the dominion of such property and his widow electing to take under the statute of descent and distribution may assert her right to a distributive share of the property in such trust at settlor's death * * *. Where a purported trust is in fact a mere agency, such agency ceases at the death of the settlor * * *."

Coming to a summation of these theories as applied to the very simple and undisputed facts surrounding the transfer of this check by Adams to the Flecks, it is the conclusion of this Court that the Negotiable Instruments Law has no place in this case but that the transfer to the Flecks was in the capacity of a bailor to a bailee to await developments and upon the death of Adams became an asset of his estate subject to all the rights afforded to his surviving spouse under the Probate Code.

Before closing this opinion, however, the Court is constrained to direct its attention to the conduct of the Flecks following the death of their client. During his lifetime there is no doubt but what they had a right to advise, instruct and guide him in any legal manner to defeat his wife's attempt to secure any portion of his property. No fault can be found in that theory. But with his death a situation developed which should have raised a question of propriety in the mind of even the very neophite of lawyers. Having resisted the widow and devised attempted means to deprive her of any interest in her husband's property; should the Flecks have undertaken any further handling of the family affairs which would lull the widow into a false sense of security in any dealings with them? It should certainly have been apparent that there might be some doubt cast upon the uncontrolled division and distribution of the proceeds of the $6000.00 check.

Charles Fleck has had many years of experience in probate matters and has had an extensive practice in this Court. Would not a prudent lawyer have made a full disclosure to all members of the family before attempting to do what the law pre-empts to the Probate Court? What specific deductions were the Flecks authorized to make after deducting their fee, if there ever was any agreement with Adams specifically fixing their fee? Their very conduct decries their defense that they thought they were carrying out the wish of the decedent.

When a distribution was made to the children, no statement of a receipt and disbursements was prepared and given to each distributee. What right did the Flecks have to pay Mrs. Charles Fleck a past due alleged rental account of $240.00? All these circumstances lead to the main query of what position was being taken by the Flecks in further representing the proposed estate in collection of the claim for pain and suffering and in attempting to make claim to the Industrial Commission on behalf of the widow and children alleging that the death was connected in cause and effect with the industrial accident?

Lawyers are in positions of trust when undertaking any task for a client. The Flecks were undertaking to represent the widow in these claims after the death of her husband. Having undertaken to continue their efforts along these lines, what was their duty to the widow?

Let us assume that the Flecks considered their fidelity and efforts lay in the protection of the children in an effort to carry out the wishes

of their deceased father. If so, they should have completely divorced themselves from any activity designed to protect the widow in any phase of the circumstances, whether in prosecution of the claim for personal injury, a compensatory death claim or a preparation for the probate of the estate. This Court feels that the Flecks should have advised the widow that they could not handle any claim for her as they had represented her husband in an adverse capacity to her during his lifetime and were now committed to representing the children in any proper capacity. Had they forgotten that their principal commitment from Adams was that they were to defeat the efforts of his widow to secure any part of his property? Had they done the proper thing under the circumstances, they would have advised her, immediately upon the death of Adams, that they could not represent her. Once they undertook to do anything legal for her, they owed her the duty of a full disclosure as to all facts surrounding their activity and the most important was a disclosure that in the immediate past history of the industrial case was a payment of $6000.00.

The relation between attorney and client is highly fiduciary in its nature and of a confidential character. The very existence of the relationship of attorney and client raises a presumption that relations of trust and confidence exist between the parties, and a presumption of invalidity arises where an undue advantage is obtained by an attorney over his client. These passages are contained in text and case books, down through the centuries. The lawyer's position is not one that can be used as a cloak for the launching of an undue advantage for himself or some third party. He must be impeccably loyal to his trust to the exclusion of the affairs of others that may create a conflict. If he suspects a conflict he should completely withdraw or fully advise all parties concerned. The termination of litigation, while it ends the power of the attorney to bind the client, does not necessarily end the duty of the attorney in dealing with the client. There are cases which show that the doctrine of **uberrima fides** (highest fidelity) may outlast the relationship itself, and that the rule should be applied so long as the influence arising from the relationship is proved to exist. 6 Corpus Juris 689. 1 Perry on Trusts (6th ed.) Section 202.

Surely the echoes of the Court decisions in the various avenues of litigation in the estate of Wright must be still ringing in the ears of all Ohio lawyers, especially those in this county practicing in Probate Court. Perhaps it might be not far amiss in this case to quote the language of Judge Stewart in this connection in **In re estate of Wright, 165 Oh St 23:**

"It is a fundamental principle of law that, where parties having different interests are involved, no lawyer can represent * * * such parties without a full disclosure, to all the parties involved, of his dual representation and the arrangements as to the compensation to be received therefrom. Every lawyer worthy of the name learns this principle **ab initio.** In fact, it is indicated in the oath of office he takes upon his admission to the bar."

The Flecks are officers of this Court. When Adams died they

56

should have known that a controversy might arise over the fund in question. They now find themselves in a position of embarrassment which could easily have been avoided by a full disclosure to the Probate Court at the time of Adams' death. Most lawyers have a well grounded approach to their position as stake holders or bailees in the event of the death of the principal. They usually consult the Probate Court before making any move involving the funds held. Certainly they do not proceed to administer the functions of the Court in estates, which seems to be what was done in this case.

Counsel may prepare a decree finding that the sum of $6000.00 herein involved became an asset of the estate of Adams immediately upon his death and that Charles Fleck and Sidney Fleck are ordered to pay to the plaintiff herein, as administratrix, that sum, with interest at 3% from the 22nd day of December, 1955, with costs of this action.

No order is made as to the defendant Aaron H. Fleck, in accordance with the proof, and the petition is dismissed as to him.

No claim or proof of an agency coupled with an interest has been interposed in this case, and, therefore, any suggestion of a right to or a lien concerning any fee due for the collection of the $6000.00 for Adams by the Flecks cannot be entertained.

The Court will prepare separate findings of fact and conclusions of law and spread the same upon the journal at the time of the entry of the decree herein.