**BOBKO et al., Appellees,**

v.

**SAGEN et al., Appellants.**

[Cite as *Bobko v. Sagen* (1989), 61 Ohio App.3d 397.]

Court of Appeals of Ohio,
Cuyahoga County.

No. 55363.

Decided June 5, 1989.

398

*James P. Carrabine,* for appellees.

*Paul Mancino, Jr.,* for appellants.

---

JOHN F. CORRIGAN, Judge.

Defendants-appellants, Burt H. Sagen and Bernice Pyle, appeal the judgment of the Probate Court of Cuyahoga County which ordered that Helen Szakacs' transfer of two parcels of real estate and three vehicles to these defendants be voided, and further ordered that these assets be returned to Szakacs' estate. We find defendants' assignments of error to lack merit and we affirm.[1]

I

On August 20, 1985, Paulette L. Bobko, as executrix of the estate of Helen Szakacs and a beneficiary of the estate, and Judith Bobko, also a beneficiary, filed a complaint for declaratory judgment with the probate court seeking to set aside Szakacs' transfer of real property and cars to Sagen and Pyle, because, they alleged, Sagen and Pyle fraudulently induced these transfers. Plaintiffs later filed an amended complaint, further alleging that if Szakacs voluntarily transferred property to defendants, she intended the transfers to be revocable.

Defendants Sagen and Pyle submitted answers denying these allegations, and the matter proceeded to trial before a referee on March 9, 1987. The evidence adduced indicated that in 1977 Szakacs executed a will which provided, *inter alia,* that after the death of various family members, defendant Burt Sagen would inherit one half of the remainder of her estate.

At or about the time this will was executed, Szakacs' son Carl began to date Judith Bobko. Helen Szakacs was eventually widowed, and her possessiveness of Carl often produced turbulence in Helen Szakacs' relationship with Judith Bobko. This turbulence increased as Carl and Judith planned to wed.

Carl Szakacs was subsequently diagnosed as having cancer, and Judith Bobko continued to see him and care for him as his health deteriorated. Following Carl's death, Helen Szakacs was left without immediate family and grew to depend upon Judith and her sister Paulette. The three women saw each other three to four times per week at this time.

---

1. Because we affirm, we do not address Paulette and Judith Bobko's assignments of error contained within their brief. See R.C. 2505.22.

Approximately six months after Carl's death, Helen purchased the house directly across the street from the Bobko family's Kuenzer Driver home in order to be closer to Judith and Paulette, whom Szakacs referred to as her adopted family. After the move, Szakacs saw the Bobkos on a daily basis.

In January 1984, Szakacs was hospitalized for a bowel obstruction. On her return home, she required constant care, and Paulette, who was laid off from her regular employment, stayed with her during the day, while Judith stayed with her at night. Both women also cooked for Szakacs, cleaned her house, cared for her pets and attended to various matters for her. All of these acts were gratuitously done.

Also in January 1984, Szakacs prepared a one-page holographic will, leaving her Kuenzer Driver home as well as a commercial building located on Pearl Road to Judith Bobko, and a home located in Holiday, Florida, to Paulette Bobko. With respect to Szakacs' third home, located on Virginia Road in Parma, the will provided that this property not be sold without first giving the tenant, defendant Bernice Pyle, an opportunity to purchase it. The will further provided that the proceeds from the sale of this home be divided among twelve people, including defendant Sagen, who had been Szakacs' attorney for approximately twenty years.

On July 24, 1984, Szakacs met with Pyle, who had a car title transfer agency in order to have Pyle transfer four vehicles which Szakacs owned. Szakacs' vehicles included a 1955 Cadillac, a 1958 Cadillac, a 1963 Studebaker Avanti, a 1980 Chevrolet station wagon, and a 1976 Chevrolet sedan. The next day, Szakacs met with Sagen to have Sagen transfer real property out of her estate. The events of both of these days are the focus of this action, and are sharply disputed by the parties.

With respect to the events of July 24, 1984, plaintiffs' evidence indicated that Pyle was contacted by Szakacs to distribute the 1958 Cadillac and Studebaker Avanti to Szakacs' cousin Carl Cherness, and the two Chevrolets to Judith Bobko. No transfer of the 1955 Cadillac was contemplated. Plaintiffs further indicated that Szakacs signed powers of attorney to Pyle to facilitate these transfers.

Testifying for the defense, Pyle stated that Szakacs instructed her to transfer both the 1955 and 1958 Cadillacs to Sagen, the Chevrolets to the Bobkos, and the Studebaker Avanti to herself. Pyle further stated that Szakacs wanted the transfers to the Bobkos to take place immediately, while the other transfers were to take place after Szakacs' death.

The undisputed evidence concerning transfer of the cars indicated that Pyle notarized the power of attorney through which the Studebaker was transferred from Szakacs to Pyle, contrary to the rules governing notaries public.

The evidence also indicated that Szakacs retained the titles and keys of all of the cars after meeting with Pyle. In addition, Szakacs removed the Studebaker from the Virginia Road property rented by Pyle, after allegedly telling Pyle that the Studebaker would be Pyle's upon her death.

With respect to the events of July 25, 1984, Margaret Cole, Sagen's former secretary, testified for plaintiffs. Cole stated that Szakacs arrived at Sagen's office some time near the lunch hour to sign deeds conveying the Kuenzer Driver home to Judith Bobko, and the Holiday, Florida home to Paulette Bobko, and to also obtain a power of attorney giving Paulette authority over her affairs. Cole further testified that she had prepared the two deeds before Szakacs' arrival, and that no other deeds concerning Szakacs' other parcels were prepared. Cole then stated that Szakacs signed the two deeds, asked Cole to have them recorded, and left Sagen's office a short time later. Cole then indicated that she did not have the deeds recorded as requested because Sagen told her that he would take care of the filing himself. Cole also stated that Szakacs was never outside her presence during her visit to the office, and at no time mentioned giving property to Sagen or Pyle.

Cole further testified that after this appointment, Szakacs repeatedly called Sagen's office requesting that deeds be returned to her. Cole also stated that she and her brother found the Bobko deeds in a file when cleaning Sagen's office. Finally, Cole testified that Sagen was angry that Szakacs was giving Paulette Bobko a general power of attorney, as he perceived this to be a threat to his potential inheritance under Szakacs' 1977 will.

On cross-examination, Cole admitted that she had filed a lawsuit against Sagen, Pyle, and Sagen's friend, Allen Gale, alleging, essentially, that she was defrauded out of $10,000.

Defendants' version of the events of July 25, 1984 is that Szakacs arrived at Sagen's office unexpectedly demanding that four deeds be prepared. The Kuenzer Driver property was to go to Judith Bobko, and the Florida property was to go to Paulette Bobko. In addition, defendants contended that Szakacs stated loudly and in the presence of others, including defendants' friends and family who happened to be present at Sagen's office, that she was giving the Virginia Road home to Pyle and the Pearl Road commercial property to Sagen. Defendants also stated that Szakacs instructed Sagen to delay filing the deeds until she was in the hospital or nursing home for the last time.

Sagen also denied that Szakacs ever called him requesting return of the deeds but admitted that Szakacs was under the impression that the deeds were revocable because of the power of attorney she had given Paulette.

The undisputed evidence regarding the events of this day indicates that Szakacs retained a life estate in all of the parcels transferred, despite

defendants' testimony that filing was to be delayed. In addition, Sagen billed Szakacs for the deeds. Finally, it is undisputed that neither Sagen nor Pyle counseled Szakacs to obtain independent advice regarding her transfer of property to them.

The unrefuted expert analysis of the deeds themselves indicated that the deeds to Sagen and Pyle were virtually the same in all respects, yet were significantly different from the deed to Judith Bobko.[2] These differences included differences in spacing, language, type style, centering, and the ink Szakacs used to sign her name to the deeds. More obviously, the Pyle and Sagen deeds were executed on copies of deed forms, whereas the Bobko deed was executed on an original manila form. Finally, the Pyle and Sagen deeds were notarized and witnessed by Sagen's friends, whereas the Bobko deed was notarized by Sagen, and witnessed by Sagen and Cole.

Evidence going to events subsequent to July 25, 1984 reveals that Szakacs went to Sagen's office again late in the afternoon of August 15, 1984 to transfer her glass business to John Gottschling. Szakacs expected Sagen to have all of the documents related to this transfer prepared on her arrival, but many were not. The evidence further indicated that everyone was in a hurry at this meeting and that Szakacs did not read all of the documents placed in front of her for signing. Gottschling himself was unaware that he had signed a stock power over to Sagen and had also signed a document appointing Sagen as statutory agent at this meeting.

The record further indicates that in early October 1984, Szakacs obtained a new attorney, Brad Zelasko, to draft what was her final will. Zelasko testified that Szakacs told him she was dying of cancer and did not trust her present attorney to draft her will. He also stated that he met with Szakacs for four hours on October 13, 1984 to obtain information regarding the contents of the will and that Szakacs was mentally sharp at this meeting. Zelasko testified that Szakacs told him of her family background, the deaths of her husband and son, and indicated that since the death of her son, she had grown close to the Bobkos.

Szakacs also told Zelasko that Burt Sagen had been her attorney for approximately twenty years and that he had handled many matters for her without charge. Szakacs therefore explained that she wanted to repay Sagen by including a specific bequest of $25,000 to him in her will, and by paying him $10,000 before her death. Apart from these provisions, Szakacs told Zelasko that she feared Sagen would come after her estate after her death

---

2. The deed to Paulette Bobko had to be re-done for unexplained reasons, and was subsequently re-executed a few weeks later. The original was not introduced at trial.

and requested that Zelasko put a clause in the will to prevent Sagen from doing so.

Szakacs next informed Zelasko of her property holdings and explained that she had recently sold her glass business, and had conveyed her Kuenzer Driver home to Judith Bobko and her Florida home to Paulette Bobko.[3]

Szakacs further explained to Zelasko that she still owned a residence on Virginia Avenue in Parma and a commercial property on Pearl Road, and told Zelasko, in detail, the names of the tenants and their monthly rental fees. Szakacs then inquired of Zelasko how to transfer both parcels to the Bobkos without the transfer being a taxable event. She further explained that the Bobkos were deserving of the property because of the care they had provided for her and also because their jobs were in jeopardy.

Finally, Szakacs explained that she owned several cars, and that Bernice Pyle, who was involved with a title transfer agency, was going to assist her with the transfer of them. Szakacs did not tell Zelasko the details of the transfers but did explain that she had a Studebaker which she was transferring to her cousin. Szakacs then indicated that the remainder of her estate was to go to the Bobkos, and for that reason, Zelasko did not think it was necessary to draft clauses regarding the various parcels specifically. Finally, Zelasko testified that he drafted the will as directed.

Szakacs was subsequently hospitalized for the last time on October 29, 1984. The Bobkos contacted Sagen and informed him of this fact. Thereafter, Sagen stated that he and Gary Habeeb visited Szakacs in the hospital and that she was "literally in a coma." Szakacs died on November 11, 1984 and Sagen filed the deeds to the parcels on November 16, 1984.

Following trial, the referee submitted a report which found that the plaintiffs had established that Sagen and Pyle were both in fiduciary relationships with Szakacs and that these defendants had failed to rebut the presumption of invalidity attending the transfers of Szakacs' property to them. The referee then concluded that the assets transferred had to be returned to Szakacs' estate. Thereafter, the trial judge adopted the report of the referee in its entirety and this appeal was commenced.

## II

■ For their first assignment of error, defendants contend that the probate court was without jurisdiction to set aside the deeds to Sagen and Pyle. This contention is disingenuous.

---

3. Zelasko subsequently discovered that these deeds had not been recorded. He informed Szakacs of this fact and she indicated that she would call Sagen immediately.

The jurisdiction of the probate court is defined by R.C. 2101.24, which provides in pertinent part:

"(C) The probate court has plenary power at law and in equity to dispose fully of any matter that is properly before the court, unless the power is expressly otherwise limited or denied by statute."

Those matters which may properly be placed before the court include declaratory judgment actions involving the administration of an estate. R.C. 2101.24; *Corron v. Corron* (1988), 40 Ohio St.3d 75, 78–79, 531 N.E.2d 708, 711–712.

Further, R.C. 2721.03 provides in pertinent part:

"Any person interested under a deed, will, written contract, or other writing constituting a contract, or whose rights, status, or other legal relations are affected by a constitutional provision, statute, rule as defined in section 119.01 of the Revised Code, municipal ordinance, contract, or franchise, may have determined any question of construction or validity arising under such instrument, constitutional provision, statute, rule, ordinance, contract, or franchise and obtain a declaration of rights, status, or other legal relations thereunder."

In addition, R.C. 2721.05 provides that:

"Any person interested as or through an executor, administrator, trustee, guardian, or other fiduciary, creditor, devisee, legatee, heir, next of kin, or cestui que trust, in the administration of a trust, or of the estate of a decedent, an infant, lunatic, or insolvent, may have a declaration of rights or legal relations in respect thereto in any of the following cases:

" * * *

"(C) To determine any question arising in the administration of the estate or trust, including questions of construction of wills and other writings."

■ These statutes, taken together, allow one responsible for the administration of an estate or personally interested in the administration of an estate to bring a declaratory judgment action in the probate court to have written instruments potentially affecting the rights and property which are the subject of an estate considered. *Corron v. Corron,* 40 Ohio St.3d at 78, 531 N.E.2d at 711.

Thus, in determining whether a declaratory judgment action may be brought in the probate court to determine the validity of *inter vivos* transfers, the underlying question is whether the property transferred is related to the administration of an estate. *Id.* at 79, 531 N.E.2d at 712.

Applying the foregoing to this action, it is clear that the probate court had jurisdiction to determine the validity of the *inter vivos* transfers to Sagen and

Pyle. That is, because the property transferred to these defendants would revert back to Szakacs' estate if the transfers were found to be invalid, this action seeking a determination of the validity of the transfers is related to the administration of Szakacs' estate. Accordingly, this action was properly heard by the probate court.

The first assignment of error is overruled.

### III

■ For their second assignment of error, defendants assert that the trial court erred in denying their demand for trial by jury. This assignment of error lacks merit.

The determination of questions of fact presented to the probate court is governed by R.C. 2101.31, which provides as follows:

"All questions of fact shall be determined by the probate judge, unless he orders them tried by a jury, or referred, as provided in sections 2101.06 and 2101.07, and sections 2315.26 to 2315.37, inclusive, of the Revised Code."

■ Where an action for declaratory judgment is properly instituted in the probate court, this code provision is applicable, and questions arising out of the trial of the issues shall be determined by the probate judge unless upon his own initiative or request of either party, the probate judge shall, in the exercise of his discretion, order such questions of fact to be tried by a jury or referred as otherwise authorized in the statutes. *Renee v. Sanders* (1953), 160 Ohio St. 279, 52 O.O. 175, 116 N.E.2d 420, paragraph five of the syllabus.

This rule applies despite language in R.C. 2311.04 which provides that issues of fact arising in actions for the recovery of real or personal property shall be tried by a jury. *Id.* at 285, 52 O.O. at 177, 116 N.E.2d at 424, construing G.C. 11379, the identical forerunner of R.C. 2311.04, and G.C. 10501–32, the predecessor to R.C. 2101.31.

In addition, R.C. 2721.10, which guarantees litigants the right to have issues of fact presented in declaratory judgment actions determined in the same manner as issues of fact are generally determined by the court hearing the action, does not contradict this rule. *Renee,* 160 Ohio St. at 283, 52 O.O. at 176, 116 N.E.2d at 423.

For the foregoing reasons, we cannot conclude that the trial court abused its discretion in denying defendants' demand for a jury trial in this action. Accord *In re Estate of Dachman* (June 13, 1985), Cuyahoga App. No. 49056, unreported, 1985 WL 6844.

**408**

## IV

For their fourth assignment of error, defendants contend that the trial court erred in concluding that the power of attorney which Szakacs gave to Pyle created a general fiduciary relationship between them. Rather, defendants argue, the power of attorney created only a limited or special agency relationship. We disagree.

Pursuant to Restatement of the Law 2d, Agency (1957) 15, Section 3:

"(1) A general agent is an agent authorized to conduct a series of transactions involving a continuity of service.

"(2) A special agent is an agent authorized to conduct a single transaction or a series of transactions not involving continuity of service."

Thus, continuity of service is the hallmark of the general agent. *Id.* at Comment *a*.

In this case, Pyle's own testimony indicated that Pyle had acted pursuant to powers of attorney to transfer titles and obtain license plates for Szakacs from 1975 to 1982. In addition, with regard to this action, Pyle was retained to transfer four vehicles and had not completed two of the transfers at the time of Szakacs' death. Finally, Pyle admitted on cross-examination that Szakacs reposed trust and confidence in her with respect to the transfers. Accordingly, we find that continuity of service was clearly established, and conclude that Pyle was a general agent because this requisite element is satisfied.

We further conclude that despite the fact that the scope of Pyle's agency was limited to transferring Szakacs' automobiles, Pyle nonetheless had a fiduciary duty to deal fairly with Szakacs in all of her dealings with Szakacs. Restatement of the Law 2d, Agency (1957) 59, Section 13, Comment *a*.

Thus, we reject defendants' claim that Pyle was a special agent and conclude that Pyle was in a general fiduciary relationship with Szakacs.

## V

For their third assignment of error, defendants assert that the trial court improperly required them to prove by clear and convincing evidence that the transfers in question were valid. This claim lacks merit.

In an action to set aside a deed to a grantee who is in a relationship of trust and confidence with the grantor, there is a presumption that the transfer is invalid and the burden is upon the grantee to establish that the transfer is valid. *McAdams v. McAdams* (1907), 80 Ohio St. 232, 88 N.E. 542, paragraph

one of the syllabus; cf. *Federman v. Stanwyck* (App.1951), 63 Ohio Law Abs. 178, 181, 108 N.E.2d 339, 341–342.

As we set forth with regard to defendants' fourth assignment of error, Pyle was in a fiduciary relationship with Szakacs. Similarly, Sagen, who had been Szakacs' attorney for approximately twenty years, was also in a fiduciary relationship with her. *Adams v. Fleck* (P.C.1958), 8 O.O.2d 302, 306, 80 Ohio Law Abs. 48, 54, 154 N.E.2d 794, 799. Accordingly, the trial court properly required the defendants to rebut the presumption of invalidity attending the transfers of Szakacs' property to them.

As to the quantum of proof required of the defendants to prove the validity of Szakacs' alleged gifts to them, we note that Ohio law requires that the recipient of an *inter vivos* gift prove by clear and convincing evidence that the gift was made. *In re Fife's Estate* (1956), 164 Ohio St. 449, 456, 58 O.O. 293, 297, 132 N.E.2d 185, 190. With this in mind, we hold that no less than this quantum of proof is required of fiduciaries seeking to establish the validity of a transfer. Accordingly, we find that defendants were properly required to meet their burden by clear and convincing evidence.

Defendants' third assignment of error is overruled.

## VI

Defendants next contend that the trial court improperly allowed statements made by Szakacs to be introduced into evidence, because, they argue, the statements are inadmissible hearsay. We disagree.

Admission of the statements of one who is now deceased is governed by Evid.R. 804(B)(5), which provides as follows:

"The statement was made by a decedent, or a deaf-mute who is now unable to testify, or a mentally incompetent person, where (a) the estate or personal representative of the decedent's estate, or the guardian or trustee of the deaf-mute or incompetent person is a party, and (b) the statement was made before the death or the development of the deaf-mute condition or the incompetency, and (c) the statement is offered to rebut testimony by an adverse party on a matter which was within the knowledge of the decedent, deaf-mute, or incompetent person."

This statute abrogates the "dead man's" statute. *Johnson v. Porter* (1984), 14 Ohio St.3d 58, 14 OBR 451, 471 N.E.2d 484, syllabus. The rule exists for the benefit of a representative of a decedent to permit the decedent to "speak from the grave" to rebut testimony of an adverse party. *Bilikam v. Bilikam* (1982), 2 Ohio App.3d 300, 305, 2 OBR 332, 337, 441 N.E.2d 845, 851. Nonetheless, defendants contend that Szakacs' statements are inadmissible

because the plaintiff presented them in their case-in-chief and not on rebuttal, as required by subsection (c) of the rule.

We rejected this same argument in *Modica v. Keith* (Feb. 28, 1985), Cuyahoga App. No. 48649, unreported, 1985 WL 6630, where we held that the requirement in Evid.R. 804(B)(5)(c) that the statements be offered to rebut an adverse party's testimony did not limit the estate to using the statements in its case-in-chief. Moreover, we reject the argument because both Pyle and Sagen testified as if on cross-examination prior to plaintiff's introduction of Szakacs' statements of contrary intention. Accordingly, defendant's fifth assignment of error is overruled.

## VII

In Assignment of Error No. 6, defendants claim that the trial court committed prejudicial error in allowing Brad Zelasko to testify to confidential communications between himself and Szakacs. In Assignment of Error No. 7, defendants contend that they were denied a fair trial because the referee took notice of Theodore Mann's report of his investigation of the transactions in question which was performed at the request of the probate court. As defendants at no time objected to Zelasko's testimony or references to Mann's investigation, these errors have not been preserved for our review. Accord *Thompson v. Preferred Risk Mut. Ins. Co.* (1987), 32 Ohio St.3d 340, 342, 513 N.E.2d 733, 736.

## VIII

For their eighth assignment of error, defendants argue that the probate judge erred in adopting the report of the referee because the report does not meet the requirements of Civ.R. 53, and because the judge failed to conduct an independent evaluation of the record. Neither contention is well-taken.

With respect to the first contention, we note that the report of the referee must, pursuant to Civ.R. 53(E), contain a statement of facts forming the basis of the referee's recommendation to the trial judge, see *Garcia v. Tillack* (1983), 9 Ohio App.3d 222, 9 OBR 372, 459 N.E.2d 918; *Nolte v. Nolte* (1978), 60 Ohio App.2d 227, 230, 14 O.O.3d 215, 216–217, 396 N.E.2d 807, 810. We find that the referee's report did indeed satisfy this requirement, as it set forth a statement of twenty-five findings of fact and thirteen conclusions of law upon which the referee's recommendation was based.

With respect to the second contention, we note that there is absolutely no evidence that the trial court failed to conduct its own independent

analysis of the facts of the case. Rather, the record indicates that the trial proceedings were transcribed and filed with the probate court and that the judge independently reviewed the record. Accordingly, this claim is rejected. Cf. *L.A. & D., Inc. v. Lake Cty. Bd. of Commrs.* (1981), 67 Ohio St.2d 384, 387–388, 21 O.O.3d 242, 244, 423 N.E.2d 1109, 1111–1112. Defendants' eighth assignment of error is overruled.

## IX

■ For their next assignment of error, defendants argue that findings of fact Nos. 4, 10, 12, 16, 17, 18, 19, 20, 21, 22, 23 and 24 are against the manifest weight of the evidence and should not have been adopted by the trial court. We reject this claim in its entirety.

■ A reviewing court will not reverse a verdict which is supported by substantial, competent evidence. *State v. Eley* (1978), 56 Ohio St.2d 169, 172, 10 O.O.3d 340, 341–342, 383 N.E.2d 132, 134; cf. *State v. Brown* (1988), 38 Ohio St.3d 305, 313, 528 N.E.2d 523, 534–535. In addition, questions of credibility are primarily for the trier of facts. *State v. DeHass* (1967), 10 Ohio St.2d 230, 39 O.O.2d 366, 227 N.E.2d 212, paragraph one of the syllabus.

In this case, all of the challenged findings are fully supported by the record, and, in fact, many of the findings were based upon testimony from defense witnesses. See, *e.g.*, findings Nos. 4, 10, 16, 21, 23. With respect to the issues where defendants' evidence was in conflict with plaintiffs' evidence, we cannot conclude that the trial court erred in finding plaintiffs' evidence to be more credible than defendants'. See, *e.g.*, findings Nos. 12, 17, 18, 19, 20, 22, 24.

Moreover, we agree with the trial court that defendants' version of the events of both July 24, 1984 and July 25, 1984 was simply implausible. First, it does not make sense for Szakacs to demand that the deeds be completed on July 25, and to wait three and one-half hours for them, only to then instruct Sagen to record them at an indefinite time in the future. Second, this alleged instruction to delay filing is not consistent with Szakacs' reservation of life estates in the parcels, and her unrefuted intent to dissipate her estate. Third, the fact that Sagen billed Szakacs for the deeds undermines his claim that Szakacs had given him a commercial parcel worth $250,000 on this day. In contrast, plaintiffs' evidence concerning Szakacs' intentions for the property was unfailingly consistent and credible, and was offered by disinterested parties such as Brad Zelasko and Margaret Cole.

Defendants' ninth assignment of error is overruled.

## X

For their final assignment of error, defendants argue that the trial court improperly awarded plaintiffs attorney fees due to defendants' failure to timely answer plaintiffs' interrogatories. Concomitantly, in Motion No. 80755, plaintiffs move to strike the narrative statement submitted in support of this assignment of error. For the reasons set forth below, we overrule both defendants' tenth assignment of error, and Motion No. 80755.

The record discloses that on February 25, 1986, plaintiffs propounded six interrogatories to defendants seeking to determine the names of the witnesses defendants intended to call and the exhibits defendants intended to introduce at trial. Defendants did not answer the interrogatories, move for a protective order, or seek an extension of time to respond. Thereafter, several days before the scheduled trial date, plaintiffs filed a motion *in limine* to have defendants prohibited from presenting trial testimony of witnesses whose identity had not been previously disclosed. Defendants then provided plaintiffs with answers to the interrogatories, and the court denied plaintiffs' motion, ordering that trial be continued due to defendants' delay in responding.

Plaintiffs subsequently moved for sanctions pursuant to Civ.R. 37(D), requesting recovery of attorney fees incurred due to the original trial date having been continued. This motion was supported by an affidavit from plaintiffs' counsel, which indicated that plaintiffs had incurred attorney fees of $2,040 as the result of defendants' delay in answering the interrogatories. An itemized time/event sheet which detailed counsel's preparation for trial on the originally scheduled date was also submitted to the court.

After a hearing on this motion, the court ordered that defendants pay plaintiffs reasonable attorney fees in the amount of $1,500 pursuant to Civ.R. 37(D), as a sanction for defendants' delay in providing discovery, finding that the delay was not justified. The court additionally concluded that no circumstances which would render the award of attorney fees unjust were present. Defendants promptly appealed the order to this court in case No. 53103, but the appeal was dismissed for want of a final appealable order. Now, with the entry of final judgment, defendants again appeal this order.

In Motion No. 80755, plaintiffs argue that this issue should not be heard because defendants did not specifically list this order as being appealed in their notice of appeal. We reject this claim and overrule the motion, as we note that all interlocutory orders may be examined when a final judgment is appealed. Thus, we now consider defendants' arguments. Defendants claim that, pursuant to Civ.R. 37(B)(2), the court should have awarded plaintiffs attorney fees only for their motion to compel defendants to answer the

interrogatories. In addition, defendants argue that the award was improper because the court did not "hear evidence" before making the award, and because there was no testimony regarding the necessity or amount of fees. None of these claims has merit.

Civ.R. 37(D) provides in pertinent part:

"If a party or an officer, director, or a managing agent of a party or a person designated under Rule 30(B)(5) or Rule 31(A) to testify on behalf of a party fails * * * to serve answers or objections to interrogatories submitted under Rule 33, after proper service of the interrogatories, * * * the court in which the action is pending on motion and notice may make such orders in regard to the failure as are just, and among others it may take any action authorized under subsections (a), (b), and (c) of subdivision (B)(2) of this rule. *In lieu of any order or in addition thereto, the court shall require the party failing to act or the attorney advising him or both to pay the reasonable expenses, including attorney's fees, caused by the failure,* unless the court expressly finds that the failure was substantially justified or that other circumstances make an award of expenses unjust." (Emphasis added.)

The first part of this rule grants the trial court discretion to take any act authorized by Civ.R. 37(B)(2) as a sanction for a defendant's failure to provide discovery. *Bilikam v. Bilikam* (1982), 2 Ohio App.3d 300, 306, 2 OBR 332, 338, 441 N.E.2d 845, 852.

The second part of the rule mandates that in lieu of or in addition to the sanctions authorized by Civ.R. 37(B)(2), the trial court must assess reasonable attorney fees against the party failing to act or the attorney so advising him. *Id.; Rogers v. Kazee* (1983), 10 Ohio App.3d 139, 142, 10 OBR 190, 193–194, 460 N.E.2d 1149, 1152–1153.

In this case, the trial court ordered defendants to pay plaintiffs $1,500 as reasonable attorney fees necessitated by defendants' failure to answer the interrogatories, in lieu of any other sanction. Thus, Civ.R. 37(B)(2) is clearly not implicated.

As to the correctness of this amount of attorney fees, we note that in an appeal of a court's actions taken pursuant to Civ.R. 37(D), the question for the reviewing court is whether the trial court abused its discretion. *Rauchenstein v. Kroger Co.* (1981), 3 Ohio App.3d 178, 180, 3 OBR 204, 205–206, 444 N.E.2d 445, 447–448; *Bors v. Story* (Feb. 27, 1986), Franklin App. No. 85AP–319, unreported, 1986 WL 15697.

In this case, we find no abuse of discretion. Defense counsel's dilatory tactics resulted in the continuance of the original trial date, causing plaintiffs' counsel's preparation for that trial date to be for naught. It is therefore

entirely fair and equitable for defendants, and not plaintiffs, to absorb the cost of this preparation. Moreover, we find no abuse of discretion with respect to the necessity of fees awarded as plaintiffs' counsel's affidavit and itemized time/event sheet submitted to the court demonstrated that he had billed plaintiffs for services directly related to proceeding with trial as scheduled, as well as contesting defendants' failure to respond to the interrogatories.

Moreover, these evidentiary materials adequately demonstrated the amount of attorney fees as they accounted for counsel's time to the tenth of an hour, and indicated the rate being charged.

Assignment of Error No. 10 is overruled.

The judgment of the trial court is affirmed.

*Judgment affirmed.*

PATTON, P.J., and JOHN V. CORRIGAN, J., concur.