In re Gaye HARRIS–MILES, Debtor.

Valerie TONWE, et al., Plaintiffs,

v.

Gaye HARRIS–MILES, Defendant.

Bankruptcy No. 94–3115.
Related No.: 94–30728.

United States Bankruptcy Court,
N.D. Ohio,
Western Division.

Sept. 12, 1995.

Valerie and Tutse Tonwe, Cleveland, OH, pro se.

Elizabeth Vaughan, Toledo, Ohio, for Defendant.

Ralph J. Lewis, Toledo, OH, for U.S.

### MEMORANDUM OPINION AND DECISION

RICHARD L. SPEER, Bankruptcy Judge.

This cause comes before the Court after Trial upon Plaintiffs' Complaint to Determine the Dischargeability of a Debt. At the Trial, the Parties were afforded the opportunity to present evidence and make arguments that they wished the Court to consider when making its decision. This Court has considered the evidence presented at the Trial, arguments of Counsel, exhibits, as well as the entire record of the case. Based upon that review, and for the following reasons, the Court finds that Defendant is indebted to Plaintiffs in the amount of Two Thousand Five Hundred Ninety-five Dollars ($2,595), and that such debt shall be found non-dischargeable.

### FACTS

Though Plaintiffs, Valerie Tonwe (hereafter "Ms. Tonwe") and her husband Dr. Tutse Tonwe (hereafter "Dr. Tonwe"), appeared pro se in this matter, "unsophisticated" would be a term inapplicable to Plaintiffs regarding their ability to represent themselves before this Court. In a two day trial, the Plaintiffs presented twenty-seven exhibits, and eight witness, and many legal and factual arguments and objections in furtherance of their claims against the Defendant/Debtor. Though previously unfamiliar with bankruptcy litigation, Plaintiffs both possess post-graduate degrees. Dr. Tonwe is a licensed physician, though the Court is presently unsure whether that license is in good standing. Valerie Tonwe was a practicing attorney up to the time that the events in question in this adversarial proceeding took place, practicing primarily in personal injury and immigration law.

The Defendant/Debtor Gaye Harris–Miles (hereafter "Ms. Miles") is also an attorney. Indeed, it was at law school that Ms. Tonwe and Ms. Miles first met. Both were law students at the same law school and became fast friends. Each visited each other's families on numerous occasions, and even lived together while they studied for the bar examination. The closeness of the relationship and the degree of trust can also be illustrated by the fact that Ms. Miles would balance Ms. Tonwe's checkbook for her, the latter having no affinity for the task.

The events in question began in February of 1991, when Ms. and Dr. Tonwe were arrested in Delaware, where they were living, for bribing a public official. The allegations concerned Ms. Tonwe's immigration law practice. Within the first week of incarceration Ms. Miles was contacted by the Tonwes' family. Ms. Miles, who was practicing law in Sandusky, Ohio, flew to Delaware and proceeded to assist the Tonwes in various ways. Ms. Miles was one of the first visitors of Ms. Tonwe while she was being detained. At trial, Ms. Tonwe testified that she wanted Ms. Miles to take the Tonwes' money, automobiles, furs, and everything else of value back to Sandusky, and set up a trust account to provide for the Tonwes' children. To this

end, Ms. Tonwe signed blank checks to her bank accounts, and a power of attorney giving Ms. Miles authority to act on her behalf.

About one week later Ms. Miles revisited Ms. Tonwe and notified her that she had found approximately Sixteen Thousand Seven Hundred Dollars ($16,700) in her bank accounts. (Ms. Tonwe was not aware of the balance in her checking accounts). Additionally, Ms. Miles found One Thousand Dollars ($1,000) in cash in an envelope in the Tonwes' household. At this meeting, Ms. Tonwe also signed an application for duplicate title regarding her 1991 Lincoln Continental. At approximately this time, Dr. Tonwe also signed an application for duplicate title for his automobile, a 1989 Pontiac Grand Am. The Tonwes contend that the applications for duplicate title were signed so that Ms. Miles could put the property in her name if doing so would be advantageous to the sale of their automobile to a buyer in Nigeria, with whom a relative had been negotiating.

Within the first month of the Tonwes' incarceration, Ms. Miles did use the applications for duplicate title signed by the Tonwes to transfer the cars into her name. Ms. Miles also testified that she was using the Lincoln both for personal and Tonwe purposes. Ms. Miles also took steps to remove the furniture from Ms. Tonwe's two law offices. Though it is unclear exactly what she did with the furniture, it is clear that she used at least some of the office equipment and furniture in her own law office in Sandusky, Ohio. Indeed, the furniture and equipment were not returned to the Tonwes until recently, and certain items are still missing. Ms. Miles also took the bulk of the approximately Seventeen Thousand Seven Hundred Dollars ($17,700) and deposited it in her attorney escrow account.

Within a month, Ms. Miles reported to Ms. Tonwe that the money in her escrow account had been depleted. She claims that it went towards phone bills, cash used for the Tonwe family, and cash used to coordinate witnesses in the Tonwe criminal proceedings. It was at about this time that the relationship between the Tonwes and Ms. Miles deteriorated. By April 8, 1991, the Tonwes revoked Ms. Miles power of attorney and demanded the return of their automobiles, cash, and other property. Ms. Miles did transfer the Grand Am when asked, but refused to return the Lincoln, claiming that she was keeping it to secure payment for her attorney fees for the work she had done for the Tonwes. The Tonwes then hired additional attorneys to pursue the return of the Lincoln from Ms. Miles. The issue was not resolved until June 24, 1991, when the Federal authorities confiscated the vehicle from Ms. Miles pursuant to a forfeiture action against the car relating to the criminal charges against the Tonwes.

In May of 1991, Ms. Miles filed a complaint in the Superior Court of State of Delaware In And For Sussex County, seeking a judgment for payment of her attorney's fees for work done for the Tonwes. The Tonwes counterclaimed. Ms. Miles filed for Chapter 7 bankruptcy relief on March 30, 1994, and the State Court action was subsequently removed to this Court. Thus, this Court must determine, in addition to Plaintiff's claim for damages, the appropriate amount of attorney's fees and any expenses Ms. Miles is due for the services rendered for the Tonwes. The final decision will therefore be a net of the Tonwes' damages and Ms. Miles fees and expenses.

The Tonwes claim three areas of damages: cash, furniture, and automobiles. The cash the Tonwes' claim as owed amounts to the Sixteen Thousand Seven Hundred Dollars ($16,700) taken from Ms. Tonwe's bank accounts, plus the One Thousand Dollars ($1,000) found in their house, less Seven Thousand Five Hundred ($7,500) which Ms. Miles either returned to them or to family members. This leaves a sum of Ten Thousand Two Hundred Dollars ($10,200). Though Ms. Miles claims that additional monies were returned to the Tonwes or their family, only the return of Seven Thousand Five Hundred Dollars ($7,500) is undisputed. The Court will address the uses of the Tonwe funds when it considers Ms. Miles' expenses.

The Tonwes also claim a total of Thirty Thousand Seven Hundred Dollars ($30,700) of damages in loss of their furniture and office equipment. Though the Tonwes claim that this furniture and equipment was purchased not long before their incarceration,

they did not document this amount with receipts or other verification. Further, the Court is not unmindful that used equipment, however recently purchased, greatly diminishes in value upon purchase and use. Finally, the Tonwes did receive a great deal of their furniture and equipment back, albeit three years later. For these reasons, and due to the grey area in which the Court is forced to make this determination in light of the conflicting testimony and lack of supporting documentation from both parties, the Court finds that the Tonwes' damages for the furniture stored, or used, or damaged by Ms. Miles should consist of a sum equal to One Hundred Dollars ($100) per month for three (3) years. Thus, the Court finds Three Thousand Six Hundred Dollars ($3,600) as an appropriate damage award for Ms. Miles misappropriation of the furniture.

The Tonwes also claim rental damages for the time the Lincoln Continental was used by Ms. Miles. Though Ms. Miles may have used the Lincoln for personal purposes before they demanded return of the vehicle on April 8, 1991, the Court finds that such use, if not authorized, was perhaps condoned. Thus, the Court finds Ms. Miles liable for rental of the Lincoln from April 8, 1991, to the time that the car was confiscated by the federal authorities, June 24, 1991. This is 77 days, to which the Court multiplies the sum of Thirty-five Dollars ($35.00) per day, to arrive at the product of Two Thousand Six Hundred Ninety-five ($2,695.00). The Court finds Thirty-five Dollars per day appropriate considering the lack of evidence produced by the Plaintiff as to the appropriate rate.

Ms. Miles claims Thirty-four Thousand Eight Hundred Dollars ($34,800.00) in fees, and further claims that all of the Seventeen Thousand Seven Hundred Dollars ($17,700) of the Tonwes' cash was used in furtherance of their interests. Ms. Miles is not able to provide a detailed summary of the time she spent on the Tonwes' behalf. Rather, the only billing she has purported to have made through the whole ordeal was a listing of billable hours per day thrown together when the Tonwes retained other legal counsel to try to regain title and possession of the Lincoln. Further, Ms. Miles insists that she was told by the Tonwes that she would receive Two Hundred Dollars ($200) an hour when they received the return of Six Hundred Thousand Dollars ($600,000) that was confiscated by the federal authorities. The Tonwes vehemently deny ever promising such a high hourly rate. The Court finds no proof to support such an extravagant hourly rate, and further finds that the billable hours detailed to be excessive considering the lack of proof presented by Ms. Miles as to the benefit conferred upon the Tonwes.

The Court does believe in the principle of Quantum Meruit, and finds it necessary to compensate Ms. Miles even considering the breach of standards of professionalism she has shown in this case. Therefore, because of the lack of description of her billable time, the Court will halve the total she has requested from One Hundred and Seventy-four (174) hours, to Eighty-seven (87) hours. The Court finds Ms. Miles request for Two Hundred Dollars ($200) completely unjustified. The Court notes that Ms. Miles usual hourly rate is One Hundred Dollars ($100) an hour. Thus, the Court finds Ms. Miles should be compensated for her services in the amount of Eight Thousand Seven Hundred Dollars ($8,700.00).

Ms. Miles also claims that the Tonwes' cash she received from Ms. Tonwe's bank accounts and cash found in the house was used to pay Tonwe expenses. However, Ms. Miles is only able to provide receipts, other than canceled checks to herself or cash, only for approximately Five Thousand Two Hundred Dollars ($5,200). The other receipts, according to Ms. Miles, were destroyed when her basement, where she kept the files, flooded. The Court finds this excuse unacceptable. It will therefore allow expenses in the amount of the receipts provided, Five Thousand Two Hundred Dollars ($5,200).

To summarize, the Court makes the following factual findings regarding the Tonwes' damages and the Ms. Miles' fees and expenses. The Tonwes are owed Ten Thousand Two Hundred Dollars ($10,200) for cash withdrawn and not returned, Three Thousand Six Hundred Dollars ($3,600) for the unauthorized use of their furniture and office equipment, and Two Thousand Six Hundred

Ninety-five Dollars ($2,695) for the unauthorized use of the Lincoln Continental. Ms. Miles is owed Eight Thousand Seven Hundred Dollars ($8,700) for services rendered, and Five Thousand Two Hundred Dollars ($5,200) for expenses. The result is Two Thousand Five Hundred Ninety-five Dollars ($2,595) that Ms. Miles owes the Tonwes.

### LAW

Relevant portions of the Bankruptcy Code read as follows:

§ 523. Exceptions to Discharge.

(a) A discharge under section 727, 1141, 1228[a] 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

(4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny.

### DISCUSSION

Having made the factual findings, supra, as to the net amount of damages owing to the Plaintiffs in this case, the only legal issue remaining is whether the aforementioned debt should be found nondischargeable. Determinations concerning the allowance or disallowance of claims against the estate, counterclaims by the estate against persons filing claims against the estate, and determinations of the dischargeability of particular debts, are core proceedings pursuant to 28 U.S.C. Section 157. Thus, this case is a core proceeding.

■ Pursuant to Section 523(a)(4) of the Bankruptcy Code, debts arising from a debtor's defalcation while acting in a fiduciary capacity are not dischargeable in bankruptcy. To establish the nondischargeability of a debt under 11 U.S.C. § 523(a)(4), Plaintiffs must show the following: the establishment of a trust; a party in trust acting in a fiduciary capacity; and a breach of that relationship by at least "defalcation" of funds. *In re Interstate Agency, Inc.*, 760 F.2d 121 (6th Cir.1985). Plaintiffs must show by a preponderance of the evidence that the debt in question was incurred through defalcation while acting in a fiduciary capacity. *In re Carroll*, 140 B.R. 313 (Bankr.D.Mass.1992)

(citing *Grogan v. Garner*, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991)).

■ Generally, the term "fiduciary" applies to express or technical trusts, not constructive or implied trusts created by operation of law or matter of equity. *In re Interstate Agency, supra*, (quoting *Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 333, 55 S.Ct. 151, 153, 79 L.Ed. 393 (1934)). The question regarding who is a fiduciary for purposes of Section 523 is subject to interpretation under federal law. The nature of the legal interests is subject to state law. *In re Johnson*, 691 F.2d 249, 251 (6th Cir.1982).

■ Under Ohio law, the attorney-client relationship is *highly* fiduciary in nature (emphasis added). *Adams v. Fleck*, 8 Ohio Op.2d 302, 154 N.E.2d 794 (1958), *aff'd* 171 Ohio St. 451, 172 N.E.2d 126 (1961). The very existence of the attorney-client relationship raises a presumption that trust and confidence exists between these parties. *Id.* Consequently, the relationship requires a high degree of fidelity and good faith. *Holtzman v. Hopwood Realty, Incorporated*, 77 Ohio App. 515, 65 N.E.2d 409 (1946). An attorney should never accept employment if the exercise of professional judgment may be affected by the attorney's own financial, personal or business interests. MODEL CODE OF PROFESSIONAL CONDUCT Rule 1.7 cmt. (1983). Likewise, an attorney should never accept employment if personal interests will adversely affect the services rendered to the client. MODEL CODE OF PROFESSIONAL CONDUCT Rule 1.7 cmt. (1983). An attorney must not intentionally fail to seek the lawful objective of the client through reasonable available means permitted by law and the Disciplinary Rules. MODEL CODE OF PROFESSIONAL CONDUCT Rule 1.2 cmt (1983). When an issue arises between an attorney and client, the burden of proof rests with the attorney to prove entitlement to compensation for the legal services rendered. *Holtzman, supra*, at 523, 65 N.E.2d 409.

■ Defalcation involves the failure to account for money or property held in a fiduciary capacity. *In re Carroll*, 140 B.R. at 316, (citing *In re Weber*, 99 B.R. 1001 (Bankr.C.D.Utah 1989)). It does not require

a showing of intentional wrongdoing. *In re Carroll*, 140 B.R. at 316, (citing *In re Golden*, 54 B.R. 957, 964 (Bankr.D.Mass.1985)). Defalcation may result from negligence or ignorance. *In re Carroll*, 140 B.R. at 316, (citing *In re Brown*, 131 B.R. 900 (Bankr.D.Me. 1991)).

*In re Garver*, 180 B.R. 181 (Bankr. N.D.Ohio 1995) is a case illustrative of the law concerning an attorney's breach of fiduciary duty as defalcation. See also *In re Hix*, 161 B.R. 401 (Bankr.N.D.Ohio 1993). At issue in *Garver* was a state court judgment against a attorney-debtor for breach of contract and legal malpractice. *Id.* at 183. The Debtor contended that no funds were mishandled or unaccounted for, and that breach of contract and legal malpractice do not constitute a defalcation. *Id.* at 184. The Court disagreed, and instead held that the existence of the attorney-client relationship satisfied the requirement under § 523(a)(4) that an express or technical trust existed. *Id.* at 185. Further, the Court looked to the definition of "defalcation" found in Black's law dictionary and held that an act defalcation is committed when, while acting a fiduciary capacity, there is a failure to meet an obligation, misappropriation of trust funds or money held in a fiduciary capacity, or an failure to properly account for the funds. *Id.* at 184. Thus, the state court judgment against the attorney-debtor was found non-dischargeable. *Id.*

 In the case at bar, Ms. Miles does not argue that an attorney-client relationship did not exist between herself and the Tonwes. Rather, Ms. Miles contends that her retention of the Tonwes' property was either done in furtherance of her duties on behalf of the Tonwes, or to secure payment of her attorney fees from the Tonwes. This Court finds that Ms. Miles actions clearly breached her fiduciary duty as an attorney, and thus committed defalcation while acting in a fiduciary capacity, in at least three ways. First, Ms. Miles failed to keep an accurate accounting of the Tonwes' property. Second, Ms. Miles improperly retained and used client property. Third, Ms. Miles failed to accurately account for the time she spent working on the Tonwes' behalf, further aggravating the other aforementioned breaches. For these reasons this Court can only find that the indebtedness of Ms. Miles to the Tonwes, as discussed in the factual findings above, is non-dischargeable.

In reaching the conclusion found herein, the Court has considered all of the evidence, exhibits and arguments of Counsel, regardless of whether or not they are specifically referred to in this opinion.

Accordingly, it is

***ORDERED*** that the Debtor Gaye Harris–Miles is indebted to the Plaintiffs Valerie and Tutse Tonwe in the amount of Two Thousand Five Hundred Ninety-five Dollars ($2,595), and that this debt be, and is hereby, found *NON–DISCHARGEABLE.*