**In re Ricky L. (Lee) HOOVER, Kathleen K. Hoover, Debtors.**

**Bankruptcy No. 2–82–01226.**

United States Bankruptcy Court,
S.D. Ohio, E.D.

July 11, 1983.

Levi W. Lile, Bellefontaine, Ohio, for debtors.

John W. Hosterman, Ashville, Ohio, for Eva Menear.

Deborah P. Ecker, Columbus, Ohio, for Estech, Inc.

John E. Bowers, Circleville, for P.C.A.

Frank M. Pees, Worthington, Ohio, Chapter 13 trustee.

FINDINGS, OPINION AND ORDER DIRECTING THE DISTRIBUTION OF PROCEEDS OF SALE OF WHEAT CROP

G.L. PETTIGREW, Bankruptcy Judge.

The matter before the Court is the application of Eva Menear for the disbursal of certain funds held by the trustee in this proceeding under Chapter 13 of the Bankruptcy Code. For the reasons set out be-

low, this Court finds that Ms. Menear is indeed entitled to a portion of these funds and orders that they be distributed as specified below.

## I.

### Facts

Sometime in 1980, the applicant, Ms. Eva Menear, agreed to rent certain real estate to the debtors for calendar year 1981. The debtors were to use this land for farming purposes, specifically to grow a crop of corn. Under the terms of this oral lease, the debtors were to pay $8,000.00 for the use of the property in two equal installments. The first installment was made in February of 1981, and the second was to have been made before the debtors harvested their corn crop, presumably in the late summer or early fall of 1981. The record does not indicate that the lessor obtained any security for the rent due. The debtors defaulted on the second rent installment. Consequently, it would appear that the applicant has an unsecured claim of $4,000.00 against the debtors' estate.

Sometime in October of 1981, while the applicant was out of state, the debtors planted a crop of wheat on the property leased from the applicant. This crop was not to be ready for harvest until well into 1982, after the expiration of the debtors' lease on the property. At the time this crop was planted, the debtors and applicant had not agreed to extend or renew the lease for 1982. At the expiration of the leasehold, the debtors apparently surrendered possession of the property, leaving the unmatured crop in the ground.

The crop in question was allowed to grow and, pursuant to a motion by the applicant, this Court ordered that the wheat be harvested by the debtors by August 3, 1982, and that it be sold in a commercially reasonable manner and the proceeds be paid to the trustee. The order was carried out.

Sometime in early 1981, the Columbus Production Credit Association (hereinafter referred to as P.C.A.) loaned the debtors $109,159.00 and took a security interest in the debtors' 1981 corn crop and any subsequent crops that they were to plant on the applicant's land. This security agreement was duly perfected by filing with the Pickaway County Recorder's Office on February 3, 1981, as per Ohio Revised Code § 1309.-38(A)(1).

On November 16, 1981, the debtors granted Estech, Inc., a security interest in any crops growing on the applicant's land. Estech filed an Article 9 Financing Statement with the Pickaway County Recorder's Office on November 29, 1981. Similarly, this interest was duly perfected.

Due to the presence of the wheat, the applicant was unable to rent the land during 1982 and, therefore, lost a substantial amount of potential revenue. Consequently, she applied for an order requiring the trustee to pay her the funds realized by the sale of the wheat. She made this request in order to recoup these losses and to make up for the debtors' default on the second installment of the rent for 1981. This application was filed, together with a supporting memorandum, on August 10, 1982.

A evidentiary hearing on the application was held. The debtor, Ricky L. Hoover, the debtor's father; the applicant; the applicant's husband; a representative from Estech; and, an expert witness on farming practices in Pickaway County testified. This Finding, Opinion and Order disposes of the issues raised at said hearing.

## II.

### Arguments of the Parties

The applicant has two arguments in support of her contention that she is entitled to the proceeds of the crop in question. The first is that upon the expiration of the lease, the debtors had no interest in the leasehold, and that consequently it and anything growing on it reverted to the applicant.

The applicant's second argument is essentially equitable. She argues that due to the debtors' default on the second rent installment and her inability to lease the land in

1982, she should be entitled to the proceeds of the crop.

The debtors counter these arguments by asserting the doctrine of "way going" or "going away crops", which in some situations allows a tenant to reenter and harvest crops that will mature after the termination of the tenant's leasehold. The debtors maintain that this case should be controlled by this doctrine.

The debtors also maintain that the crops were personal property and hence did not revert back to the applicant with the leasehold.

Finally, the debtors argue that the applicant would be unjustly enriched if she is allowed the proceeds of the crop, as she would reap the benefit of the debtors' labor and expense in planting the crop. Therefore, they ask that the Court invoke the doctrine of *quantum meruit* and allow them to at least collect the reasonable value of their labor and expenditures.

### III.

#### *Issues*

1. Does the doctrine of "way going" or "away going" crops apply in the present case?

2. Was the crop in question real property such that it would revert to the applicant along with the underlying real property upon the termination of the debtors' leasehold estate?

3. What rights, if any, do the secured creditors have in the crop?

4. What right, if any, does the applicant have to compensation for the use of her land after the termination of the debtors' leasehold estate?

### IV.

#### *Discussion*

#### A. *Way Going Crops.*

Due to the prevalence of farmers leasing the land on which they grow their crops, it sometimes occurs that a crop will not be ready for harvest until after the termina-tion of the farmer's leasehold interest in the land. The common law jurisdictions have developed two legal responses to this problem, the doctrine of emblements and the doctrine of way going crops.

The doctrine of emblements operates in situations where the farmer's leasehold is of an indefinite duration. In such a situation, the doctrine holds that the farmer will be able to reenter the land and harvest his crop after the expiration of the leasehold. The courts developed the doctrine to provide some protection against unforeseen changes in the farmer's rights that could occur because of the caprice or death of his lessor. *Foster v. Robinson,* 6 Ohio St. 90 (1856). While this doctrine has been recognized in Ohio, 3 Ohio Jur.3d, *Agriculture and Crops* § 4, it would not appear to be applicable to the case at bar as the debtors' lease was for a definite term.

The doctrine of way going crops is similar to the doctrine of emblements in that it too deals with the farmer's rights to crops which will mature after the expiration of his lease. However, the doctrine applies in situations where the farmer's lease is definite and in the majority of American jurisdictions operates to prevent the farmer from reentering the land to harvest his crop. However, a few states, including Ohio, have held that if it is customary in the local area, the doctrine will operate to allow the farmer to reenter and collect his crop. *Foster, supra. Prysi v. Kinsey,* 38 Ohio App. 92, 175 N.E. 707 (1930). However, it must be shown that this is the local custom.

■ Applying this to the present case, it becomes apparent that the doctrine of way going crops, as delineated by the Ohio Supreme Court, would not be applicable. At trial, only one witness testified as an expert and spoke to the local customs of the Pickaway County Agricultural Community. He testified that it is not customary for farmers to be allowed to harvest crops that mature after the expiration of their leasehold interests. Therefore, it would seem

that the debtors' reliance on this doctrine is misguided.[1]

■ It also appears that contrary to the suggestion of the debtors, it would not be appropriate to grant them relief in the nature of *quantum meruit*. While the authorities do not directly speak to the applicability of *quantum meruit* in way going crop situations, it would appear that such a remedy would not be appropriate in the present case. The debtors knew that their lease would expire before the crop in question would mature, yet they planted without making provisions for its harvest. While this is not the type of conduct ordinarily considered to constitute "unclean hands", this Court feels that the debtors' own actions foreclose the availability of the equitable remedy of *quantum meruit*.

### B. Crops as Real or Personal Property.

As mentioned above, the applicant argues that at the expiration of the debtors' lease, the crops growing on the leased property reverted to her along with the land. Implicit in this argument is the assumption that the crops were part of the realty. The debtors counter this by arguing that the crops were personalty and hence did not revert to the applicant with the land. Hence, it becomes important to determine the true nature of the crops.

The early case law on the legal status of growing crops is ambiguous at best. The earliest case to discuss the matter, *Baker v. Jordan*, 3 Ohio St. 438 (1854), stated in *dicta* that annual crops are generally considered to be personalty. However, the case recognized an exception, not applicable to the present case, involving written deeds.

1. As will be discussed later, this doctrine only precludes the debtors' claim to the proceeds of the crop. It does not affect the rights of the secured creditors.

2. As discussed above, growing crops will pass with real estate *conveyed* without specific provision regarding title to the crops. However, Ohio case law defines the terms "conveyed" and "conveyance" as having reference to the passage, by deed, of the entire fee. The following excerpt from *Langmede v. Weaver*, 65 Ohio

Later in the same term, the Supreme Court stated, again in *dicta*, that growing wheat is generally considered to be part of the realty on which it grows. *Youmans v. Caldwell*, 4 Ohio St. 71, 72 (1854). Yet a third case, *Herron v. Herron*, 47 Ohio St. 544, 25 N.E. 420 (1890), held that growing crops pass with land conveyed pursuant to judicial decree, thus intimating that they were part of the realty. However, none of these cases directly dealt with the question. The first two cases involved the admissibility of parol evidence to show the intentions of the vendor and vendee in situations where the deed made no mention of growing crops. The third case dealt with the scope of a court order of conveyance which also failed to delineate the status of crops growing on the land in question.

■ In the 1930s, two cases came down which squarely held that growing crops are personalty and hence subject to chattel mortgages. See *First Security Co. v. Huddle*, 16 Ohio Law Abs. 241 (1934); *Jacks v. Virginia Joint Stock Land Bank*, 17 Ohio Law Abs. 464 (1934, App.). These Ohio appellate courts appear to state the better view. The following excerpt from *First Security, supra*, 16 OLA at 243, seems to state the proper relationship between the dicta of the older cases and the positions espoused by these newer cases:

"Annual crops are in existence from the date of planting and from then on are personal property subject to sale and execution and, of course, may be mortgaged. This rule has an apparent exception in that crops pass with the realty on sale and conveyance unless reserved."

So it would appear that Ohio case law treats crops as personalty, absent certain non-applicable exceptions.[2] Furthermore,

St. 17, 37, 60 N.E. 1130 (1901) at 37, 60 N.E. 1130, states this well.

"... the term 'conveyed,' used in reference to the transfer of lands by the owner to another person, fairly imports that the conveyance is by a legally executed deed which transfers the whole title. To convey real estate, is to transfer the legal title to it from the owner to another by an appropriate instrument. *Abendroth v. Greenwich*, 29 Conn. [356] 365. Land is conveyed only

this result is reinforced by the adoption of the Uniform Commercial Code, which treats crops as personal property. Ohio Revised Code Ann. §§ 1302.02, 1302.03, 1309.07. Hence, the applicant's argument that the crop reverted to her along with the underlying real property is not well taken.

## C. *Rights of the Secured Creditors.*

As mentioned earlier, both P.C.A. and Estech had duly perfected security interests in the crop in question prior to the expiration of the debtors' leasehold interests in the property owned by the applicant. Both entered into valid security agreements with the debtors which granted them their respective rights in the crop as required by Ohio Revised Code §§ 1309.14, 1309.15. Financing statements evidencing these interests were filed by P.C.A. on February 3, 1981, and by Estech on November 25, 1981. Hence both P.C.A. and Estech had properly perfected security interests in the crop, which attached when the crop was planted, in P.C.A.'s case, and on November 29, 1981, in Estech's case. Ohio Revised Code §§ 1309.14, 1309.21, 1309.22.

As between P.C.A. and Estech, it is obvious that under the U.C.C.'s first to file rule, P.C.A. has the first priority, as it filed its financing statement in February of 1981 while Estech did not file until November of that year.

Although there is surprisingly little authority on the issue of the rights of a secured party with a security interest in a crop to that crop when the ground upon which the crop is growing reverts to one other than the debtor, it appears that such a creditor retains his security interest in the crop. The only case that seems to have addressed the issue is *United States v. Newcomb*, 33 UCC 1748 (8th Cir.1982). In that case, the debtor entered into an installment land contract covering the land upon which a soybean crop was planted. Subsequently, the debtor granted the Farm Home Admin-

istration a security interest in the crop to secure loans made by that agency. Eventually the debtor defaulted on the land contract and the contract vendor initiated court proceedings that ended with his recovering possession of the real estate. The vendor harvested the crops and the Farm Home Administration sued, alleging that due to its security interest in the crop, the vendor's action constituted a conversion. The District Court held that Missouri, the situs of the real estate, in enacting the U.C.C., determined that it controls the outcome in situations such as this one where a crop secured lender's rights conflict with the rights of the owner of real property.

■ The Circuit Court of Appeals affirmed the District Court, holding that since Article 9 of the U.C.C. is intended to control any transaction involving a security interest in goods, it controlled this transaction as it involved a security interest in goods as refined by the U.C.C. The following excerpt from *Newcomb, supra,* at 1752, 1753 is illustrative of the court's reasoning.

"The purpose and scope section of Article 9, § 400.9–102, provides that it 'applies so far as concerns any personal property and fixtures within the jurisdiction of this state (a) to any transaction (regardless of its form) which is intended to create a security interest in personal property or fixtures including goods.' For the purposes of Article 9, 'goods' includes growing crops. § 400.9–105(1)(f); cf. § 400.2–107 (including growing crops within the definition of goods for purposes of Article 2); § 400.9–109(3) (classifying 'farm products' as goods if crops or products of crops in the possession of a debtor engaged in farming operations); *Cargill, Inc. v. Hale,* 537 SW2d 667, 668 [19 UCC Rep 1059] (Mo Ct App 1976) (soybean crop as goods for purposes of Article 2). Thus, Article 9 controls any transaction

when the title to it passes. *Fairfax v. Lewis,* 11 Leigh (Va.) [233] 248. A conveyance is a deed which passes or conveys land from one person to another. *Brown v. Fitz,* 13 N.H. [283] 285. Jacobs, L.D. The Century dic-

tionary defines the word 'convey,' to mean in law, 'to pass title by deed;' and the word 'title' to mean the 'ownership, absolute ownership, the unincumbered fee.' "

intended to create a security interest in growing crops."

In light of the fact that the code sections referred to by the Circuit Court in *Newcomb* are identical to the corresponding sections of the Ohio Uniform Commercial Code, this Court finds the Eighth Circuit's reasoning persuasive, and in the absence of any authority to the contrary, adopts it in the case at bar. Therefore, this Court finds that the crop in question was subject to the security interests of P.C.A. and Estech, Inc. Furthermore, such interests remain attached to the proceeds of this crop by virtue of Ohio Revised Code §§ 1309.14(C) and 1309.25(B).

D. *The Applicant's Right to Compensation.*

Although both P.C.A. and Estech have valid security interests in the proceeds of the crop by virtue of Ohio's Uniform Commercial Code, their rights to these proceeds are not absolute. Both Ohio and federal law mandate that the disposition of this case be tempered by equitable considerations.

When Congress set out to reform the bankruptcy laws in 1978, it enacted what was to become 28 U.S.C. § 1481, which provides, in part, that "a bankruptcy court shall have the powers of a court of equity. . . ." This was a codification of the historically recognized equitable nature of bankruptcy proceedings in general. *Bank of Marin v. England,* 385 U.S. 99, 87 S.Ct. 274, 17 L.Ed.2d 197 (1966); *Sampsell v. Imperial Paper Co.,* 313 U.S. 215, 61 S.Ct. 904, 85 L.Ed. 1293 (1941); *Pepper v. Litton,* 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939). This Court finds that it would be inequitable to allow P.C.A. and Estech to enjoy the proceeds of the crop in question without compensating the applicant for the use of her land while the crop matured.

Section 1301.03 of the Ohio Revised Code states that:

"Unless displaced by the particular provisions of Chapters 1301., 1302., 1303., 1304., 1305., 1306., 1307., 1308., and 1309. of the Revised Code, the principles of law and equity, including the law merchant and the law relative to capacity to contract, principal and agent, estoppel, fraud, misrepresentation, duress, coercion, mistake, bankruptcy, or other validating or invalidating cause shall supplement its provisions." (emphasis added)

This section of the Uniform Commercial Code (U.C.C. 1–103) has been recognized to be of great importance. One of the leading works on the Code describes the import and impact of this section in no uncertain terms.

"Section 1–103 also deals with general equitable principles. It would have been better had the drafters dealt with these in a separate section. The relations between general equitable principles and Code provisions are quite unlike the relations between general legal principles and Code provisions. One primary function of the corpus of Code sections is generally to displace prior legal principles. But it is not a primary function of these sections to displace prior equitable principles. To put this another way, Code sections 'occupy the legal field' except insofar as they do not 'particularly' displace pre-existing legal principles. But it is wrong to think of the relation between Code sections and general equitable principles in this way. *Code sections do not 'occupy the equity field.' Rather, general equitable principles remain largely intact, for they are only rarely 'particularly displaced.' In a sense, then, they are the main occupants of the relevant field. This follows from their basic character. Unlike general legal principles, they do not merely supplement Code sections; their function is also to carve exceptions from or otherwise modify Code sections, and the courts have recognized as much.* These functions are not peculiar to the bearing of 1–103 equitable principles on Code rules; they are characteristic of the bearing of equitable principles upon legal rules throughout the law. . . .

"With 1–103 and related law on the books, judges can escape the ancient dilemma of either adhering to the legal rule and doing an inequity, or of doing equity but in an unlaw-like fashion. *In-*

**438**

deed, 1–103 imposes a duty on the judge to reach the equitable result unless the relevant general equitable principle has been particularly displaced." (emphasis added) White & Summers, *Handbook of The Law Under The Uniform Commercial Code.* 19–20 (2d ed. 1980). See also R. Summers, *General Equitable Principles Under Section 1–103 of The Uniform Commercial Code,* 72 Nw.L.Rev. 906 (1978). This Court finds that this statutory mandate cannot be disregarded in this case.[3]

■ The Ohio Supreme Court in the case of *Hummel v. Hummel,* 133 Ohio St. 520, 14 N.E.2d 923 (1938), stated that "In our judgment unjust enrichment of a person occurs when he has and retains money or benefits which in justice and equity belong to another." *Id.* at 528, 14 N.E.2d 923. In the present case, just such a situation is presented. The secured creditors enjoyed the benefit of using the applicant's land to increase the value of their collateral. As a result of this, the applicant was denied the use of the land. To allow P.C.A. and Estech to retain this benefit without fairly compensating the applicant would be unconscionable. Hence, under Ohio law, the applicant is entitled to reasonable compensation for the use of her land. *Cincinnati v. Fox,* 71 Ohio App. 233, 49 N.E.2d 69 (1943); *Roberts v. Lee,* 72 Ohio App. 235, 51 N.E.2d 108 (1942); *McClanahan v. McClanahan,* 79 Ohio App. 231, 72 N.E.2d 798 (1946). Restatement of Restitution § 1 (1937). Furthermore, the fact that there was no wrongful conduct on the part of either P.C.A. or Estech does not change this result. The essence of restitution is to do justice, not to punish wrongdoing. 18 Ohio Jur.3d *Contracts* § 343. It would seem, therefore, that this is a case in which the

application of Ohio Revised Code § 1301.03 would be particularly appropriate.[4]

On the basis of the foregoing, this Court orders that the proceeds of the crop in question are to be distributed as follows: $4,666.69 to the applicant as compensation for the use of her land.[5] Any funds remaining will first be applied to the satisfaction of P.C.A.'s secured claim. If any funds remain after the applicant and P.C.A. are paid in full, then they are to be applied first to the satisfaction of Estech's secured claim, and then any surplus is to be turned over to the debtors.

IT IS SO ORDERED.

---

**3.** It is settled law that the list of supplementary provisions listed in § 1301.03 is merely illustrative and not exhaustive. See official comment to § 1301.03.

**4.** See Restatement of Restitution § 117(1) Illustration (1) (1937).

**5.** Testimony presented at the hearing indicated that the property on which the crop was grown

was rented to the debtors for $8,000.00 a year. This breaks down to $666.67 a month. Since the crop was on the applicant's land for seven months after the expiration of the debtors' lease, the total rental for that period, assuming the $8,000.00 annual rental value of the land, was $4,666.69.