**In re Charley Mae NELSON, Debtor.**

**Bankruptcy No. 96–51462.**

United States Bankruptcy Court,
Northern District of Ohio,
Eastern Division.

March 31, 1997.

David Nager of Taubman & Nager, Cleveland, OH, for Claimant.

Maryanne Rackoff and Thomas T. Mullen of Scanlon & Co., L.P.A., Akron, OH, for Debtor.

## MEMORANDUM OPINION RULING ON DEBTOR'S OBJECTION TO THE PROOF OF CLAIM FILED BY TAUBMAN AND NAGER.

MARILYN SHEA–STONUM, Bankruptcy Judge.

This matter is before the Court after the evidentiary hearing on the Debtor's Objection to the Proof of Claim filed by Bruce D. Taubman of the law firm Taubman & Nager. Appearing at the hearing were David Nager, counsel for claimant Bruce D. Taubman, and Thomas T. Mullen and Maryanne Rackoff, counsel for Debtor. The Court heard the testimony of Bruce D. Taubman, Richard Haber, Dennis J. Bartek, and Charley Mae Nelson. This Court considered their testimony and the exhibits admitted during the evidentiary hearing in reaching its decision.

### I.  JURISDICTION

This matter involves the allowance or disallowance of a claim against the bankruptcy estate of Charley Mae Nelson. Pursuant to 28 U.S.C. § 157(b)(2)(B), resolution of this matter is a core proceeding. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 157(a) and (b)(1) and by the Standing Order of Reference entered in this District on July 16, 1984.

### II.  ISSUE PRESENTED

At issue is a claim for alleged legal services made by Attorney Bruce D. Taubman. Mr. Taubman represented the debtor in a personal injury matter unrelated to her bankruptcy case under a contingency fee agreement. Prior to the resolution of that matter and before the filing of her chapter 13 case, the debtor discharged Mr. Taubman. Mr. Taubman now invokes the equitable powers of the bankruptcy court by seeking the payment of his fees under the theory of quantum meruit as interpreted by Ohio courts.

### III.  FINDINGS OF FACT

Debtor, Charley Mae Nelson, filed a petition for relief under Chapter 13 of the Bank-

ruptcy Code on June 28, 1996. The plan which she has filed proposes to pay holders of allowed unsecured claims 100 cents on the dollar. On August 19, 1996, Bruce D. Taubman of the law firm Taubman and Nager filed his proof of claim for $19,454.96 allegedly based on legal services performed for Ms. Nelson ($16,000) and expenses incurred on her behalf ($3,454.96). Thereafter, the Debtor filed an objection to this proof of claim. The evidentiary hearing on Debtor's Objection commenced on December 19, 1996 at the Court's weekly Chapter 13 docket and continued on January 14, 1997. Based upon the documentary evidence and testimony admitted at the hearing, the Court makes the following findings of fact:

1. The parties agree that on July 2, 1994, the debtor was the driver of the first car in a rear-end collision, and as a result of the accident she suffered physical and psychological injuries. The debtor's son, Reggie Nelson, and his ex-girlfriend, Alice Clark, were passengers in the debtor's car when the accident occurred.

2. A few days after the accident, the debtor, her son and his ex-girlfriend sought legal representation. This was the first time Ms. Nelson had ever retained a lawyer. She called Bruce D. Taubman on the recommendation of a member of the church that she attends. On July 6, 1994, the three accident victims met Mr. Taubman at the Ocasek Building in Akron, Ohio, their hometown, to discuss his potential representation of them in this matter.

3. At that meeting, Ms. Nelson, her son, and his ex-girlfriend each signed a separate document entitled "Attorney Agreement—4R." The copy of the "Attorney Agreement–4R" submitted to the Court as Plaintiff's

Exhibit A ("PX A") is a contingency fee agreement between Bruce Taubman and Charley Mae Nelson.[1] The testimony of Mr. Taubman conflicts with that of Ms. Nelson on whether the document was filled in at the time she signed it. However, the testimony is clear that Ms. Nelson thought she had hired Mr. Taubman to represent her interests as they related to the car accident in which she was involved.

According to Mr. Taubman's testimony, he discussed contingency fee percentages with Ms. Nelson during that first meeting; he conceded that they did not discuss costs, expenses or advances, subjects on which PX A is silent. According to Ms. Nelson's testimony, the terms of the agreement were not discussed. The debtor testified that when she told Mr. Taubman that she could not afford an attorney, Mr. Taubman told her that would not be a problem, stating that he would work hard for her because the more she got the more he got. She merely understood from his comments to her on that day that in exchange for representing her he would receive a portion of whatever she received.

The proof of claim submitted by Mr. Taubman sought to collect the fullest measure of the terms of PX A. At the hearing, however, Mr. Taubman through his counsel acknowledged that the basis of his claim is not contractual but rather a quantum meruit claim. PX A is relevant only as establishing a ceiling amount of his claim. Thus, because of the law of Ohio further limiting the legitimate claim to the reasonable value of services proven to have been rendered, it is not essential for the Court to make a finding with regard to this conflicting testimony. The Court does note that the form chosen by

1. The agreement reads as follows, "This agreement entered into this 6 day of July, A.D. 1994, by and between Bruce D. Taubman Attorney at Law, hereinafter called the First Party, and Charley Nelson hereinafter called the Second Party, Witnesseth: The said first party, for the consideration hereinafter stipulated, has undertaken and does hereby undertake and agree with said second party to act as her Attorney in negotiating for a settlement, and if same is not effected, in bringing, conducting and prosecuting an action against an unknown trucking (sic) to recover damages for personal injury which occurred on

about the 2 day of July, A.D. 1994, and in consideration for services so rendered and to be rendered by said first party, it is agreed that he shall receive a sum of money equal to 40 per cent of whatever recovery may be had in the case on the suit thereof; and in case said claim is settled prior to suit then said first party shall receive an amount equal to 33½ per cent of whatever may be received in such settlement.

In witness whereof, the parties hereto have hereunto set their hands _____, the day and year first above written.

Witnesses: X (Charley M. Nelson)"

Mr. Taubman for PX A does call for a witness, a formality that Mr. Taubman chose not to employ.

4. Ms. Nelson received $5,000 as a settlement for the damage to her car. Neither party disputes that Mr. Taubman obtained this property settlement for Ms. Nelson. However, debtor's expert witness, Dennis Bartek, testified that when the property settlement and the related personal injury case are handled by the same attorney, the attorney does not usually take a separate fee for obtaining a property settlement.

5. The uncontroverted testimony of Ms. Nelson reflects that in March, 1995, Ms. Nelson was not satisfied with Mr. Taubman's representation because he had not communicated with her concerning any progress in the case after the property settlement. She attempted to discharge him. After speaking with an unidentified attorney about how to discharge her counsel, Ms. Nelson called Mr. Taubman and told him he was fired. The uncontroverted evidence is that Mr. Taubman then told Ms. Nelson that he had already filed her personal injury lawsuit in Clinton County Common Pleas Court. The copy of the complaint filed in Clinton County Common Pleas Court and attached to pleadings before this Court is, however, time stamped April 10, 1995. Relying on Mr. Taubman's representation, Ms. Nelson believed her lawsuit to have been filed and did not terminate her relationship with him until March, 1996. As noted above, Mr. Taubman's representation as to the status of the filing of the lawsuit in March, 1995 is not supported by the documentary evidence.

6. After Ms. Nelson had testified, Mr. Taubman was recalled to the stand to give rebuttal testimony. At no point during his testimony on direct, cross, or recall did Mr. Taubman contradict Ms. Nelson's testimony about her attempt to discharge him in March, 1995.[2] The record evidence supports only one conclusion: Ms. Nelson's effort to exercise her right to dismiss Mr. Taubman in March, 1995 was thwarted by his apparent lack of candor and honesty with his client about the status of her case.

7. Prior to the scheduled trial date[3], in March, 1996, Mr. Taubman informed Ms. Nelson of a $40,000 settlement offer. Ms. Nelson testified that when she informed him that she wished to have the matter tried and did not accept the settlement, Mr. Taubman replied "Those people down there don't care anything about you, those white people. You are black, the truck driver is black and he's got a white witness and Alice and Reggie have already settled so they won't be there and it doesn't make any sense for you to go down there."[4] At that point, Ms. Nelson no longer trusted Mr. Taubman and did not want him to handle her case anymore.

8. Neither party disputes that during this phone conversation Ms. Nelson told Mr. Taubman that she no longer wanted him as her attorney. His response, as reflected in Plaintiff's Exhibit E and in Ms. Nelson's testimony, was that "the only way this could be done at this late juncture was to obtain the court's permission and that regardless, I had an attorney's lien on the file for my expenses plus fees based on the settlement offer I obtained for you."[5] Ms. Nelson conferred with another attorney, and with the

2. This Court allowed post hearing briefs to be submitted by the parties on this issue. Mr. Taubman took that opportunity to attach an affidavit which reads: "I, Bruce D. Taubman, being duly sworn, depose and state that the Debtor Charley Mae Nelson did not discharge the law firm of Taubman & Nager in March, 1995. Affiant further states that if Ms. Nelson had discharged the law firm of Taubman & Nager in March, 1995, then no more legal services would have been provided to her after the date of discharge." This statement simply ignores the central question of whether Mr. Taubman induced Ms. Nelson to drop her March, 1995 effort to discharge him through his affirmative misrepresentation.

3. The precise trial date was not identified during the hearing in this Court, but PX H makes reference to the preparation of a trial brief.

4. The quoted language is Ms. Nelson's paraphrase of Mr. Taubman's response. When Mr. Taubman returned to the stand after her testimony, he did not controvert that a communication such as this occurred.

5. Excerpt of Plaintiff's Exhibit E which is a letter dated April 9, 1996 from Mr. Taubman to Ms. Nelson, which the parties agree reflect the position initially taken by Mr. Taubman in the phone conversation.

Judge presiding over her case in Clinton County about discharging Mr. Taubman. Then, by a letter dated March 25, 1996, she again informed Mr. Taubman she was dismissing him as her attorney. (PX C)

9. In support of his claim for the reasonable value of the services he rendered until his discharge in March, 1996, Mr. Taubman submitted Plaintiff's Exhibit H ("PX H") to the Court. PX-H is a 22 page document captioned "Charley Nelson Time Schedule" which lists the alleged dates of services allegedly performed for Charley Nelson, descriptions of those services, and the alleged amount of time spent performing those services for a total of 140.5 hours for which he claims to be entitled to compensation at the rate of $250.00 per hour.[6] PX-H is an after-the-fact construction of time allegedly spent on the debtor's personal injury case by anyone in Mr. Taubman's office, i.e., Mr. Taubman, his secretary and various law clerks. The document was created by Mr. Taubman and his law clerk, Jennifer Louther (ph), in anticipation of this litigation. They made no indication as to who performed the services listed on the document, nor did they provide detailed descriptions of the services performed.

On direct examination, Mr. Taubman testified that he could not remember everything that he did in Ms. Nelson's case. Mr. Taubman stated at the hearing that because his practice primarily consists of contingency fee cases, he does not keep track of the work done by himself, his law clerk, or his secretary. In fact, his deposition testimony (as summarized by the debtor's expert witness) was that he does not know which services listed on PX H were performed by him and which were done by his law clerk.

For instance, PX H reflects a 2.50 hour charge (at $250.00 per hour) on July 11, 1995 for the "Preparation of answers to Defendant's First Set of Interrogatories." Mr.

Taubman testified on direct examination that his law clerk prepared the answers with Ms. Nelson and that he reviewed the answers. Ms. Nelson testified that she answered the interrogatories with the law clerk, Jennifer. Mr. Taubman was not present while she was answering the interrogatories. Yet, no indication is made on PX H to show that the time indicated reflects the time of a law clerk, who was paid only $10 per hour, not the time of an attorney.

10. Mr. Taubman said on direct examination that he performed the following work on the debtor's personal injury case: initial interview; obtained police report; attempted to contact two witnesses; sent a letter of representation to the defendant; filed a complaint and an amended complaint to sue the trucking company and the driver; answered the cross-claim; ran ads in the newspaper to look for witnesses; participated in telephonic pre-trials with the Court; attempted to obtain personnel records of defendant; prepared and took the driver's deposition; obtained and reviewed all of the debtor's medical records; took two doctors' trial depositions; filed a trial brief; and engaged defendant's counsel about settlement.

However, on cross examination, Mr. Taubman testified that no document in the personal injury case was drafted exclusively by him. He said that all of the time is billed at the same rate regardless of the work involved or the person performing the work. His counsel conceded that the position Mr. Taubman was adopting in pursuing this claim was based on the premise that anyone working under his supervision, including his secretary, should be billed at an hourly rate of $250.00 per hour. Further, he testified that he did not do any research, legal or medical, for this case because, in his opinion, no research was necessary. Mr. Taubman said he did not forgo work to represent Charley Nelson.

---

**6.** According to the figures listed by Mr. Taubman in PX H the value of his services should be $35,125.00 plus expenses, but the proof of claim filed by Mr. Taubman is for $16,000 plus expenses. Apparently, recognizing that Ohio law limits an attorney's maximum recovery in quantum meruit to the disavowed contingent fee agreement amount, Mr. Taubman filed a proof of claim based on 40 per cent of the $40,000 settlement offer which Ms. Nelson chose not to accept, plus expenses. At first blush, the recognition of the $16,000 ceiling would appear to be a reduction of the hourly rate to approximately $113 per hour. However Mr. Taubman's insistence on valuing his services at $250 per hour is not avoided for the reasons developed below.

11. Ms. Nelson testified that prior to his discharge in 1996, Mr. Taubman hardly ever talked to her. Her communications and interactions with the law firm of Taubman & Nager were primarily with either Mr. Taubman's secretary or law students employed in his office and not with her attorney, Mr. Taubman. However, Mr. Taubman was present on the day of her deposition, her son's deposition and his ex-girlfriend's deposition. Although at the evidentiary hearing Mr. Taubman's counsel stated that his client did not bill Ms. Nelson for the time spent preparing for or attending her deposition, PX–H reflects a charge for time spent preparing for and attending the debtor's deposition, totaling three hours (1.5 hours each on December 5 and 6, 1995). Upon recall, Mr. Taubman testified that he remembered spending four to six hours preparing Ms. Nelson for her deposition in addition to doing the actual deposition.

12. Although PX A is silent on the issue of expenses, Ms. Nelson testified that she assumed that Mr. Taubman was incurring expenses on her behalf. If he did incur expenses, she acknowledges her responsibility for them. The debtor's expert witness, Mr. Bartek, testified that Mr. Taubman should be reimbursed for those expenses incurred on behalf of Ms. Nelson which Mr. Taubman actually paid.

The final page of PX H lists two categories of expenses: expenses paid and expenses outstanding. The "expenses outstanding," totaling $2004.27, have not been paid by Mr. Taubman, according to a representation made by Mr. Taubman's counsel at the hearing. The "paid expenses" category lists expenses totaling $1450.69.

13. Mr. Taubman represented all three plaintiffs, the debtor, her son, and his ex-girlfriend, in the personal injury case mentioned above.[7] While testifying, Ms. Nelson stated that although she did not accept the settlement offered to her, the other two plaintiffs did accept settlement offers. As previously noted, the offer relayed to Ms. Nelson was for $40,000. Ms. Nelson testified that she did not know the amount for which the other plaintiffs settled. Further, the Court was not presented with any evidence regarding the true value of the plaintiff's personal injury suit. Thus, this Court cannot measure the quality of the settlement offer relayed to Ms. Nelson.

14. Debtor's expert Dennis J. Bartek[8] testified that accurately recreating time records is difficult. In Mr. Bartek's expert opinion, if an attorney does not keep contemporaneous records of time spent, the attorney should err on the side of caution in recreating those records of time spent. In his opinion, Mr. Taubman exhibited no such caution when constructing PX H. Further, Mr. Bartek testified that in his opinion the attorney work done in this case consists solely of drafting and filing a complaint, and an amended complaint pursuant to Rule 15(a), reviewing the answers to the debtor's interrogatories, preparing for and taking four depositions. This work represents no more than 20–25 hours of work.

15. Mr. Taubman seeks to bill Charley Nelson at the hourly rate of $250.00. He has been an attorney for 20 years, and he asserted that 50 per cent of his practice consists of personal injury cases, although he has not handled many "brain injury" cases. Mr. Taubman argued that the $250.00 per hour rate was justified by the specialized, unique and novel nature of this case. However, nothing in the record indicates that he treated this case as if it were specialized, unique and novel.

---

7. Neither party raised the issue of the potential conflict of interest resulting from the representation of co-plaintiffs in a personal injury action. Ohio EC 5–17 provides that whether a conflict exists when co-plaintiffs are represented by the same attorney depends upon an analysis of each case. Since neither party raised the issue, the Court will not address it further.

8. The parties stipulated to Mr. Bartek's expertise on the issue of fees. Mr. Bartek has been an attorney for twenty five years. His practice is primarily in litigation—plaintiff's personal injury, insurance defense, criminal cases, business litigation. He is a member of the Ohio State Bar Association, American Trial Lawyers Association, and the Akron Bar Association. Mr. Bartek stated that he had been retained as an expert fifteen to twenty times and had testified as an expert approximately six times.

Richard Haber, counsel for the defendants in the debtor's personal injury suit, testified that he billed his clients $90.00 per hour, which is his normal rate for insurance defense work. Further, Mr. Haber testified that he spent approximately 60 hours on the debtor's personal injury case.[9] Mr. Haber's practice area is general litigation, consisting primarily of personal injury and employment law. When Mr. Haber is not doing insurance defense work, he bills his clients at an hourly rate of $120.00.

In Mr. Bartek's opinion, $250.00 per hour is an unreasonable hourly rate in this circumstance. He testified that a reasonable rate of compensation for this type of case in Northeastern Ohio might be $150.00 per hour. The factors that Mr. Bartek considered in reaching that opinion included certain pleadings and other documents that he had reviewed [10], the length of time Mr. Taubman has been in practice, the amount of expertise and the degree of difficulty involved, and the lack of need to defer other employment.

16. Mr. Bartek testified that the reasonable and customary method of hourly billing is to bill in .1 hour increments. The method used by Bruce Taubman, billing in .25 hour increments, is an unreasonable practice because it leads to compounding overstatement. For instance, PX H lists charges on January 20, 1995, February 3, 1995, March 17, 1995, June 2, 1995, and October 26, 1995 of .25 hours each for "receipt of bill from Pain Management Technologies," totaling 1.5 hours. Mr. Bartek testified that he is familiar with the billing practices of Pain Management Technologies and surmises that the six bills received are "repeat bills." Thus, Bruce Taubman apparently seeks to charge $375.00 to receive the same bill six times. Mr. Bartek testified that this charge is not reasonable or customary, even if Mr. Taubman actually reviewed the bill each time it arrived.

17. Mr. Bartek compared the charges listed on PX H for phone calls made with the record of outgoing phone calls from Taubman & Nager.[11] In one instance, the phone company record of outgoing calls reflects a two minute call to Charley Nelson's home number on November 3, 1995. However, PX H reflects a .25 hour charge for that same phone call. On November 6, 1995, PX H lists four phone calls: one to Dr. Morgan-Minott, one to Dr. Lefkovitz, one to Dr. Pogorelec, and one to Dr. Toth. PX H reflects a .25 hour charge for each phone call. According to Mr. Bartek's testimony, the firm's outgoing phone records show the total amount of time taken for all four of those phone calls to be less than six minutes. In short, a full hour is charged when the most that could have been justified (assuming Mr. Taubman was a party to these calls) is one-tenth of an hour.

Mr. Bartek testified that the aggregate time shown for outgoing phone calls made in connection with the Nelson matter, according to the firm's outgoing phone records from November, 1995 on, is 5 hours and 32 minutes. However, Mr. Taubman, according to PX H, seeks to bill 25.5 hours for phone calls made and 1.50 hours for phone calls received in that same period.

18. Based upon the testimony of Ms. Nelson's expert, the Court finds that an hourly rate of $150.00 to be the appropriate rate in the initial assessment of Mr. Taubman's services. However, because he failed to identify the extent and nature of the services he personally provided, this finding is of limited use. He appears to have relied upon law clerks and secretaries to perform the vast majority of the activities identified in PX H. Based upon Mr. Taubman's hearing testimony, Mr. Bartek's summary of Mr. Taubman's deposition testimony and the Court's review of PX H, he does not appear to have spent

9. By comparison, claimant's counsel argued that Mr. Taubman had spent 140.5 hours. The more accurate comparison would be Mr. Haber's 60 hours to Mr. Taubman's not more than 15 hours. See Finding 18, infra.

10. Mr. Bartek testified that he reviewed Mr. Taubman's deposition, PX H, a brief by debtor's counsel; various attachments to correspondence

and court pleadings; and the disciplinary code as it pertains to fees.

11. Although the record is silent on this precise point, the Court assumes that these phone records are the same source from which Mr. Taubman worked in constructing PX H.

more than 15 hours on this matter and perhaps significantly less.

19. More troubling is the question of whether Mr. Taubman ever had the intention of proceeding to the actual trial of Ms. Nelson's case [12] if that was the course which his client, in the exercise of her prerogative in the attorney client relationship, chose.[13] His suggestion that, as a person of color, she would not receive a fair hearing at a trial in Clinton County was an extremely troubling assertion, its timing making it even more so.[14] Mr. Taubman had apparently not communicated with his client about possible venue choices. Thus, hearing from her counsel shortly before her trial was to begin that her case had been filed in a county where he did not believe that she would receive an unbiased hearing would have been a particularly upsetting event. Certainly Ms. Nelson acted in a rational manner in seeking legal representation from counsel who had not developed a negative view of her case and the attitude of potential Clinton County jurors solely on the basis of race.

## IV. LAW

### A. 11 U.S.C. § 502(a)

Initially, a claim for which a proof of claim is filed is deemed allowed. 11 U.S.C. § 502(a). The proof of claim is considered *prima facie* evidence of the validity and amount of the claim. Bankruptcy Rule 3001(f). However, if a party in interest objects to the claim, the claim is no longer deemed allowed. The Court, after notice and a hearing, shall determine the amount of the claim. 11 U.S.C. § 502(b).

At the hearing, the objector bears the initial burden of presenting evidence sufficient to overcome the presumption of validity given to the proof of claim. Once sufficient evidence is presented to overcome that presumption, the burden shifts to the claimant to prove the validity and amount of the claim by a preponderance of the evidence. Collier on Bankruptcy, ¶ 502.02[2][f]. The allowance or disallowance of a claim in bankruptcy is a matter of federal law left to the bankruptcy court's exercise of its equitable powers. *In re Johnson,* 960 F.2d 396, 404 (4th Cir.1992); *see* 11 U.S.C. § 502.

In this case, the debtor, a party in interest, filed an objection to the claim of Bruce D. Taubman for legal services and expenses. Thus, the debtor bore the initial burden of overcoming the presumption of validity afforded a proof of claim. The debtor met this burden by providing the Court with evidence, in particular Mr. Bartek's testimony, that demonstrated the absence of any basis for crediting PX H. The burden then shifted back to the claimant, Bruce D. Taubman, to prove to the Court the amount and validity of his claim by a preponderance of the evidence.

---

**12.** The court is not naive and recognizes that the majority of personal injury cases are settled prior to trial. There is then a practical need to balance preparation time against the likelihood of the trial going forward. In this instance, however, the record evidence does not show that Mr. Taubman was really prepared to try this case. Had Ms. Nelson accepted the settlement offer, the evidence demonstrates that the effective hourly rate for his services would have been in excess of $1,000 per hour.

**13.** Attorneys may counsel their clients regarding the advantages and disadvantages to settlement. The final decision, however, is the client's. Ohio EC 7–7.

**14.** Although this Court does not know the specifics of the personal injury action, this Court is troubled by the apparent failure of Mr. Taubman to seek a venue that he believed would be fair to Ms. Nelson. Several venue options may have

been available. Rule 3(B) of the Ohio Rules of Civil Procedure provides that "Proper venue lies in any one or more of the following counties: (1) The county in which the defendant resides; (2) The county in which the defendant has his principal place of business; (3) A county in which the defendant conducted activity that gave rise to the claim for relief; ...; (7) in actions described in Rule 4.3 (Process; out-of-state service), in the county where the plaintiff resides ... The defendant in the debtor's personal injury case does not reside in Ohio, but in Tennessee, according to the caption of the time stamped copy of the complaint filed in Ms. Nelson's personal injury matter. When a person causes tortious injury in Ohio by actions arising out of the ownership, operation, or use of a motor vehicle in Ohio, venue lies in the county in which the plaintiff resides." See O.R.C.P. 3, and 4.3(A)(3). Thus, it appears that venue would have been proper in Summit County, where the plaintiff/debtor resides, as well as in Clinton County, where the accident occurred.

## B. State Law Considerations

Prior to making its determination pursuant to 11 U.S.C. § 502 on the allowed amount of the claim, the Court must determine the existence of the claim as a matter of state law. Ohio law provides for the recovery of the reasonable value of the services rendered on the basis of quantum meruit when the attorney is discharged, with or without cause, and whether the contract was express or implied. *Reid, et al. v. Lansberry,* 68 Ohio St.3d 570, 629 N.E.2d 431, 434 (1994); *Fox & Associates Co., L.P.A. v. Purdon,* 44 Ohio St.3d 69, 541 N.E.2d 448 (1989). Although under their contingency fee agreement Mr. Taubman was to receive a percentage of Ms. Nelson's recovery (*see fn. 1, infra*), the debtor, Ms. Nelson, terminated Mr. Taubman prior to the resolution of her case. Thus, Mr. Taubman is not entitled to recover based on the contingency fee agreement between himself and Ms. Nelson. Rather, under Ohio law, upon the successful occurrence of the contingency, Mr. Taubman may recover only the reasonable value of the services he rendered not to exceed the amount provided for in the disavowed contingent fee agreement. *See Reid, et al.,* 629 N.E.2d at 436; *see also Fracasse v. Brent,* 6 Cal.3d 784, 100 Cal.Rptr. 385, 390, 494 P.2d 9, 14 (1972).

### 1. DETERMINING THE REASONABLE VALUE

Under Ohio law, the Court should consider the totality of the circumstances involved when determining the recovery of a discharged contingent fee attorney. *Reid,* 629 N.E.2d at 435. Ohio DR 2–106 provides the following factors to be considered as guides,

(1) The time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly. (2) The likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer. (3) The fee customarily charged in the locality for similar legal services. (4) The amount involved and the results obtained. (5) The time limitations imposed by the client or by the circumstances. (6) The nature and length of the professional relationship with the client. (7) The experience, reputation, and ability of the lawyer or lawyers performing the services. (8) Whether the fee is fixed or contingent.

The factors to be considered are based on the equities of the situation. Those factors, as well as the ultimate amount of quantum meruit recovery for a discharged attorney, are matters to be resolved by the trial court within the exercise of its discretion. *Reid, et al., v. Lansberry,* 629 N.E.2d 431, 435–36.

As to the first set of factors provided in DR 2–106(1) this Court was not presented with any credible evidence, testimonial or documentary, on the amount of time and labor spent by Mr. Taubman performing legal services for the debtor.

The Ohio Supreme Court recognizes that attorneys operating on a contingency fee basis do not always maintain detailed records concerning hours and expenses. Despite this possible difficulty of proof, a discharged attorney must establish the reasonable value of services rendered. An attorney operating under even a contingent-fee contract who wishes to keep the option of asserting a quantum meruit claim in the event of a dismissal by the client should keep an accurate record of time and resources expended. *Reid,* 629 N.E.2d at fn. 3. Mr. Taubman did not keep an accurate record of time and resources expended, nor did he provide this Court with a credible after-the-fact construction of time and resources expended.

The legal questions involved in the debtor's personal injury case were not novel or difficult. Mr. Taubman did not perform any research in this case. *See* Finding 10. He testified that much of the work done in this matter was done by a law clerk employed by him. The complaint filed in this matter was drafted by his law clerk; the debtor answered the interrogatories with his law clerk; not one document was drafted exclusively by Mr. Taubman. Apparently, in Mr. Taubman's judgment, the great bulk of the work involved in this case could be adequately performed by a third year law student. Although Mr. Taubman had little experience with the particular injuries suffered by Ms.

Nelson, he did not undertake any medical-legal research on that subject, nor did he direct that any be done.

The parties agree that Mr. Taubman did not forgo any work to represent Charley Nelson, and Mr. Taubman admitted that he was not operating under any pressing time limitations imposed by his client or the circumstances. Thus, a consideration of factors two and five does not lend support to Mr. Taubman's claim that his reasonable hourly rate is $250.00.

Two more factors that this Court considered are (1) the fee customarily charged in the locality for similar legal services and (2) the experience, reputation, and ability of the lawyer or lawyers *performing* the services. The expert testimony was that the reasonable hourly rate for an attorney in a case similar to the debtor's personal injury case with the experience, reputation, and ability similar to that of Mr. Taubman is $150.00. However, that rate should be used only when Mr. Taubman is performing "lawyer's work." At most, a lower hourly rate should be used when billing for the services actually performed by a non-lawyer or a law clerk or for services that could have been performed by such personnel. Mr. Bartek testified that when services are performed by his law clerk he either does not charge the client or he charges the client only what he pays his law clerk.

The reasonable rate of compensation is directly related to the skill of the person performing the service. Thus, billing at the same rate for services performed by a law clerk and services performed by an attorney and services performed by a secretary is not reasonable. Mr. Taubman's own testimony was that he did not perform all 140.5 hours of the services purportedly identified in PX H. Yet, PX H bills all 140.5 hours of the work allegedly performed for the debtor at the unreasonably high rate of $250.00 per hour.

The evidence shows that the reasonable hourly rate in this situation is at most $150.00 per hour for work actually performed by Mr. Taubman, not $250.00 per hour. The Court was not presented with any evidence from which it could make a determination as to whether Mr. Taubman or someone else performed the services listed. Therefore, the Court cannot determine how many hours of work performed may be valued at the reasonable hourly rate of compensation for an attorney of $150.00 per hour. Mr. Bartek's testimony was that 20–25 hours of work in this case was "lawyer's work," but the record also demonstrates that Mr. Taubman chose to have a law student perform much of this "lawyer's work."

This Court considered each of the factors listed and the totality of the circumstances in arriving at its decision. *Reid, et al. v. Lansberry*, 629 N.E.2d at 435–36. The analysis of the factors reveals that Mr. Taubman failed to meet the burden of establishing his chosen hourly rate as the reasonable hourly rate for his services and that he failed to establish the reasonable amount of time that either he or his support personnel actually expended on the debtor's personal injury case.

Acknowledging these shortcomings, Mr. Taubman's counsel argued that this Court should award "what is fair." This presents at least two problems. In fee matters, courts should not be expected to fill in the spaces left blank in the claimant's proofs. Second, the equities of the situation do not weigh in Mr. Taubman's favor. His behavior towards his client, his lack of candor about the status of her case, and his attempt to collect a clearly excessive fee weigh strongly against rewarding Mr. Taubman with a recovery based in equity.

## C. 11 U.S.C. § 502(b)

Having determined that a claim based on quantum meruit may exist under Ohio law, this Court now considers what, if any, the allowed amount of the claim should be. A claim shall be allowed except to the extent that the claim, based on allegedly performed legal services, is unenforceable under applicable law and/or exceeds the reasonable value of such services. 11 U.S.C. § 502(b)(1) and (b)(4). Mr. Taubman had the burden of proving the amount and enforceability of his claim. Numerous factors are embedded in the issue of enforceability. The Court will discuss each before reaching a final conclusion, as they are to some extent interwoven.

1. 11 U.S.C. § 502(b)(1)—Unenforceability

A claim shall be disallowed to the extent that the claim is unenforceable against the debtor and property of the debtor under any applicable law, including state law, for a reason other than because the claim is contingent or unmatured. 11 U.S.C. § 502(b)(1). The claim at issue here is based on the equitable theory of quantum meruit as interpreted by Ohio Courts.

### a. EQUITABLE PRINCIPLES AND DEFENSES

■■■■■ An action in quantum meruit requires the application of equitable principles, like fairness and justice, to the facts and circumstances at hand. *National City Bank v. Fleming, et al.*, 2 Ohio App.3d 50, 440 N.E.2d 590, 599 (1981). Quantum meruit means "as much as deserved" and is an action imposed for reasons of justice and the avoidance of inequity. *Id.; see Sonkin & Melena Co., L.P.A. v. Zaransky*, 83 Ohio App.3d 169, 614 N.E.2d 807, 811 (1992). A party seeking relief on this basis must be able to overcome the "lack of clean hands" defense. *Castelli v. Lien*, 910 S.W.2d 420, 428 (Tenn.Ct.App.1995); *see In re Hoover*, 31 B.R. 432, 435 (Bankr.S.D.Ohio 1983).

■■■■■ Unclean hands is a defense that will prevent a party from recovering in equity and is based on the axiom that to get equity, one must do equity. Inequitable acts by a party seeking to recover in equity will prevent that party's recovery. However, those inequitable acts must bear some proximate relation to the subject matter in controversy to prevent the party's recovery in equity. Black's Law Dictionary 1367 (5th Ed.); *see Jones v. Hyatt Legal Services, et al., (In re Dow)*, 132 B.R. 853, fn. 2 (Bankr.S.D.Ohio 1991). Thus, the enforceability of Mr. Taubman's claim which is based on quantum meruit is subject to the general principles of equity, and to the equitable defense of "unclean hands".

■■■ Applying those principles, the Court finds the majority of Mr. Taubman's claim to be unenforceable. The fiduciary relationship between the attorney and client exists as a matter of law and requires the attorney to exercise the utmost good faith and fairness in dealing with a client. *See Tonwe v. Harris–Miles (In re Harris–Miles)*, 187 B.R. 178, 182 (Bankr.N.D.Ohio 1995). This Court finds that Mr. Taubman's undisputed failure to disclose and his affirmative misrepresentation to his client, Ms. Nelson, in March, 1995 regarding the filing of a complaint on her behalf evince a lack of good faith and fair dealing.

Prior to March, 1995, Mr. Taubman may have been exercising the utmost good faith and fairness in dealing with the debtor. After March, 1995, Mr. Taubman was no longer doing so. Thus, after March, 1995 Mr. Taubman may not have had the requisite "clean hands" to be able to recover his fees in quantum meruit. Standing alone, this lack of candor might have been overcome by diligent representation thereafter. Instead, it was compounded by both his apparent relative personal inattention to Ms. Nelson's case after he commenced the litigation and the approach which Mr. Taubman took in calculating the claim that he presented to this Court.

### b. VIOLATING DR 2–106

■■■ In Ohio, DR 2–106(A) reads "A lawyer shall not enter into an agreement for, charge, or collect an illegal or clearly excessive fee." Mr. Taubman filed a proof of claim seeking compensation at the contractual rate, even though he had been discharged by his client and Ohio case law is now clear that is not the appropriate measure. By doing so, Mr. Taubman charged and attempted to collect a clearly excessive fee.[15] Ohio law is clear that upon discharge, Mr. Taubman is not entitled to fees based on the contingency fee agreement. Yet, he told Ms. Nelson that she owed him a fee based on that agreement. See Finding 8, infra.

This violation of DR 2–106 may justify a forfeiture of any fees. Mr. Taubman seeks to recover the fair and reasonable value of his services. However, in some states the balance of the equities would prevent him from being able to take advantage of the rule adopted by the Ohio Supreme Court in *Fox* and *Reid*.

---

**15.** This was also the implicit message of his April 1995 letter to Ms. Nelson. (PX E).

A violation of DR 2–106 is an ethical transgression of a most flagrant sort as it goes directly to the heart of the fiduciary relationship that exists between attorney and client. To permit an attorney to fall back on the theory of quantum meruit when he unsuccessfully fails to collect a clearly excessive fee does absolutely nothing to promote ethical behavior.

*White v. McBride*, 937 S.W.2d 796 (Tenn. 1996); *see Alexander v. Inman*, 1996 WL 709369 (Tenn.App.); *but see Tonwe v. Harris–Miles (In re Harris–Miles)*, 187 B.R. 178 (Bkrtcy.N.D.Ohio 1995) (allowing claim for legal fees based on quantum meruit despite "the breach of standards of professionalism [the attorney] has shown in this case" to be setoff against a nondischargeable debt).

### 2. 11 U.S.C. § 502(b)(4)— EXCESSIVE FEES

■ A claim shall be disallowed to the extent that if the claim is for services of an attorney of the debtor, such claim exceeds the reasonable value of the services. 11 U.S.C. § 502(b)(4). The Court should consider the totality of the circumstances involved in the situation when determining the reasonable value of an attorney's services. The inquiry involved under 11 U.S.C. § 502(b)(4) is similar to the inquiry required by Ohio law before an attorney may recover in quantum meruit.

■ Because of the requirement that applications for professional compensation must be reviewed by the bankruptcy court, bankruptcy courts are well experienced in determining the reasonableness of fee requests. The Sixth Circuit set forth ten factors that may be considered as guidelines in determining the amount of attorney's fees to be awarded under 11 U.S.C. § 330. *In re Hunt*, 124 B.R. 263, 265 (Bankr.S.D.Ohio 1990) *citing Cle–Ware Industries, Inc. v. Sokolsky*, 493 F.2d 863 (6th cir.1974). Although these factors were employed to determine "reasonable compensation" pursuant to 11 U.S.C. §§ 327, and 330, they are useful criteria to a determination of reasonable value pursuant to 11 U.S.C. § 502(b)(4). Those factors are: (1) The amount of work done; (2) the novelty and difficulty of the questions involved; (3)

the skill requisite to perform the legal service properly; (4) the results accomplished; (5) whether the fee is fixed or contingent; (6) the amount involved in connection with the services rendered; (7) the length of time consumed; (8) the experience, reputation and ability of the attorneys; (9) the size of the estate; and (10) the opposition met. *Cle–Ware*, 493 F.2d 863. The court also suggests consideration of the customary fee, the preclusion of other employment by the attorney, the undesirability of the case and awards in similar cases.

These guidelines provide little help, however, if the person seeking fees has not set forth with specificity the services for which compensation is requested. "Each entry should indicate who performed the services, the time spent, the nature of the activity performed, and the relevance of that activity to matters in the case." *In re Sly*, 77 B.R. 115, 118 (Bankr.N.D.Ohio 1986); *In re Hunt*, 124 B.R. 263, 265 (Bankr.S.D.Ohio 1990); *accord In re Beyer*, 169 B.R. 652, 656 (Bankr. W.D.Tenn.1994).

■ In determining the reasonable hourly rate, the court should distinguish between "legal work" and other work which can be accomplished by a nonlawyer. *In re Oakes*, 135 B.R. 511, 513 (Bankr.N.D.Ohio 1991); accord *In re Beyer*, 169 B.R. 652, 658. Tasks that can be performed by or are performed by a law clerk or secretary should be billed at a lower rate. *In re Sly*, 77 B.R. at 119; *see In re Oakes*, 135 B.R. at 514.

### a. FAILURE TO EXERCISE BILLING JUDGMENT

■ The fiduciary duty owed to a client is breached when an attorney fails to exercise billing judgment and overcharges for services rendered. *Coughlin v. SeRine*, 154 Ill.App.3d 510, 107 Ill.Dec. 592, 507 N.E.2d 505 (1987). Because Mr. Taubman was asserting his right to payment from Ms. Nelson in the context of a proof of claim filed in the bankruptcy court, that duty was amplified by the obligations of individuals asserting claims in bankruptcy. In his after-the-fact construction of services, Mr. Taubman had the opportunity to reflect on his services

and their value. In constructing PX H, he opted not to engage in such reflection.

The record evidence makes clear that Mr. Taubman sought to overcharge the debtor, subject to the $16,000 ceiling, when he billed her for 140.5 hours of work, all at $250.00 per hour. This breach of the fiduciary duty owed by Mr. Taubman to Ms. Nelson and failure to base his claim on a realistic construction of the services rendered and their value are further evidence of his "unclean hands."

 Had Mr. Taubman made a serious attempt to document his fee request properly, he would have taken the following steps: An attorney must provide sufficient and accurate documentation of each fee request so that the Court may determine the reasonableness of the request. The fees should be reduced by the Court to reflect any inadequacies in documentation. *See ECOS, Inc. v. Brinegar,* 671 F.Supp. 381 (M.D.N.C. 1987). Each entry would identify the person who performed the service, and avoid generic descriptions of the services allegedly rendered, in favor of particularized descriptions.

Because these steps were not taken, this Court will reduce that portion of Mr. Taubman's claim that is equitably allowable to reflect these inadequacies in his documentation. Attorneys should exercise discretion over all entries; failure to exercise this billing judgment compels the court to use its own billing judgment. *In re The Leonard Jed Company,* 118 B.R. 339, 343 (Bankr. D.Md.1990). The evidence before the Court, specifically PX H, shows that Mr. Taubman exercised almost no billing judgment in this matter. See Finding 16. Therefore, this Court is compelled to exercise its billing judgment.

## V. CONCLUSION

Therefore, this Court allows Mr. Taubman's claim in an amount equal to the amount of expenses paid and recognizes, subject to the Chapter 13 claims process, the debtor's liability to third parties for unpaid

16. Each holder of an unpaid claim will be notified of their right to file a proof of claim in her

expenses.[16] For work conducted prior to March 1995, when Mr. Taubman failed in his duty of candor to his client, he will be compensated at the rate of $150.00 per hour. The Court will estimate that time to be four hours, which is more than reported for that time, but gives credit for the property settlement. The phrase "reasonable value" begs. the question in whose eyes. From the perspective of Ms. Nelson, Mr. Taubman's services came to appear counter-productive and of negative value to her. That perspective was well supported at the hearing. Accordingly, for all of the foregoing reasons, the remainder of Mr. Taubman's claim is disallowed. Mr. Taubman is the holder of an allowed general unsecured claim in the amount of $2050.69 to be paid in accordance with her chapter 13 plan.

**IT IS SO ORDERED.**